No. 57          December 31, 2015          475

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Petitioner on Review,*

*v.*

LINDA JEAN BONILLA,
*Respondent on Review.*

(CC 11CR2221FE; CA A153808; SC S062962)

En Banc

On review from the Court of Appeals.*

Argued and submitted September 15, 2015.

Paul L. Smith, Assistant Attorney General, Salem, argued the cause. Anna M. Joyce, Solicitor General, filed the brief for petitioner on review. With her on the brief was Ellen F. Rosenblum, Attorney General.

Ernest G. Lannet, Chief Defender, Salem, argued the cause and filed the brief for respondent on review.

BREWER, J.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

Landau, J., concurred and filed an opinion, in which Kistler, J., joins.

_____

* Appeal from Douglas County Circuit Court Ronald Poole, Judge. 267 Or App 337, 341 P3d 751 (2014).

**BREWER, J.**

Police officers entered a residence without a warrant and opened a wooden box that they found in a bedroom, believing that they had lawful consent to take each of those actions. Defendant, who was charged with unlawful possession of a controlled substance based on evidence found in the box, moved to suppress the evidence under Article I, section 9, of the Oregon Constitution, on the ground that the persons who had given consent to the home entry and the search of the box were not authorized to give consent. The trial court denied the motion to suppress. On appeal from her ensuing conviction, defendant asserted that there was no evidence that she had consented to the home entry or the search of the box. The state replied that, for purposes of Article I, section 9, the persons who gave consent to the entry and search had actual authority to do so. The Court of Appeals reversed. Focusing specifically on the search of the box, that court rejected the state's argument that the person who had consented to the search had actual authority to give consent, based on her shared possession and control of the room in which the box was located. *State v. Bonilla*, 267 Or App 337, 344-47, 341 P3d 751 (2014).

In its merits brief on review before this court, the state abandoned its "actual authority" theory of consent in favor of a revised theory that the warrantless search of the box was justified under Article I, section 9, on the ground that a person with apparent authority—from the perspective of the police officers—had given her consent, and that that was sufficient to qualify the search as a lawful consent search. Finally, at oral argument, the state asserted that, regardless of whether there was lawful consent to the warrantless search of the box, the dispositive issue under Article I, section 9, should be whether the search was reasonable in light of the information available to the police at the time. According to the state, the search of the box was lawful under that standard.

As explained below, we conclude that the warrantless search of the wooden box in this case was not authorized under the consent exception to the warrant

requirement.[1] We further conclude that the state's alternative argument—that the search was lawful because it was reasonable—is essentially a request to overturn this court's longstanding construction of Article I, section 9; in the absence of a sufficiently developed argument to justify such reconsideration, we decline to consider that argument on its merits. Accordingly, we affirm the decision of the Court of Appeals, reverse the trial court's order denying suppression, and remand to the trial court for further proceedings.

Our summary of the facts is largely based on the trial court's findings, augmented by undisputed evidence in the record. Police officers arrived at the residence of a parolee, Fleshman, to investigate a report that he was involved in drug activity. There, they spoke to Dabbs, who told them that Fleshman and his girlfriend, Crowe, lived in a converted garage behind Dabbs' house, that they were in the process of moving out, and that Fleshman was not home at the time. The officers asked to speak with Crowe. Dabbs led the officers back behind his own house to the converted garage. Access to the dwelling was through an open doorway leading to a storage area, inside of which was a second, interior door. The interior door was closed. The officers followed Dabbs through the open doorway into the storage area and waited there while Dabbs contacted Crowe and explained to her that the officers wanted to talk to her about Fleshman. Crowe told Fleshman that the officers could enter through the interior door. They did so, and found themselves in a living room, where Crowe and defendant were present. Dabbs then left.

Soon after entering the living room, the officers asked Crowe about a strong odor of marijuana inside the residence. Crowe told them that it was probably coming from a back room, where her grandmother was present. One of the officers asked if he could accompany Crowe to the back room and Crowe responded that he could. Crowe and the officer walked down a short hallway to a closed door, which Crowe opened. Inside was a small bedroom that was furnished with a single bed and a recliner. Crowe introduced

---

[1] Like the Court of Appeals, we do not reach the question of whether the officers had valid consent to enter the home.

the officer to her grandmother, Bull, who was sitting in the recliner. Crowe then returned to the living room.

Bull admitted to the officer that she had been smoking marijuana and that she did not have a medical marijuana card; she produced a bag of the drug, which the officer confiscated. The officer then asked Bull if he could "check to make sure" that there were no more drugs, and Bull told him that he could. On a "headboard type thing" next to the bed, the officer saw a wooden box; he opened it and discovered three plastic bags that contained a white crystalline residue. He asked Bull about the substance and she responded that it was not hers and that it must belong to her daughter. It was at that point that the officer first learned that Bull shared the bedroom with her daughter. After ascertaining that Bull's daughter was defendant—the other woman in the living room—the officer returned to the living room. He told defendant what he had found in the box and then asked for *her* permission to search the bedroom. Defendant gave her consent, and the officer resumed his search of the bedroom, ultimately finding, in addition to the baggies, several "snort tubes" that also contained a white crystalline residue. Defendant was charged with unlawful possession of a controlled substance, ORS 475.894, after tests confirmed that the white residue was methamphetamine.

Before trial, defendant moved to suppress the evidence found in the search of the bedroom, relying primarily on Article I, section 9.[2] She argued that the evidence was obtained through a series of warrantless searches—including the entry by the police officers into the open storage area of the converted garage, their search of the box, and their second search of the bedroom after defendant's shared occupancy of the bedroom was disclosed. Defendant further argued that, although the officers believed that they had obtained lawful consent for each of those actions, the persons who purportedly had consented to the initial entry and the search of the box—respectively, Dabbs and Bull—had

---

[2] In a memorandum of "Points and Authorities" attached to her suppression motion, defendant cited both Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution as authority for her motion. Defendant's arguments, however, were directed primarily, if not entirely, at Article I, section 9.

no actual authority to give such consent. As to her own consent to the second search of the bedroom, defendant argued that it was obtained through exploitation of the officers' earlier unlawful searches, and thus did not excuse the failure to obtain a warrant. The trial court, however, accepted the state's contrary arguments that the police officers had obtained lawful consent at every stage. It denied defendant's motion to suppress, and defendant ultimately was convicted of the charged offense. Defendant then appealed, assigning error to the denial of her motion to suppress.

To place the parties' arguments on appeal and review in a more meaningful context, it is helpful to briefly describe several principles that guide our analysis. This court has adopted a categorical view under Article I, section 9, that, subject to certain specifically established and limited exceptions, deems warrantless searches to be *per se* unreasonable. *See State v. Bridewell*, 306 Or 231, 235, 759 P2d 1054 (1988) ("Absent consent, law enforcement officials must have a warrant to search a person's premises. Warrantless entries and searches of premises are *per se* unreasonable unless they fall within one of the few specifically established and carefully delineated exceptions to the warrant requirement."); *see also State v. Mazzola*, 356 Or 804, 810, 345 P3d 424 (2015) (same); *State v. Kurokawa-Lasciak*, 351 Or 179, 186, 263 P3d 336 (2011) (same); *State v. Meharry*, 342 Or 173, 177, 149 P3d 1155 (2006) (same); *State v. Connally*, 339 Or 583, 587, 125 P3d 1254 (2005) (same); *State v. Snow*, 337 Or 219, 223, 94 P3d 872 (2004) (same).

This court has described consent to a search as an "exception" to the warrant requirement under Article I, section 9. *See*, *e.g.*, *State v. Weaver*, 319 Or 212, 219, 874 P2d 1322 (1994). We have done so, not because we excuse the failure to obtain a warrant for an exceptional reason, but because consent relinquishes a person's privacy interest in property so that there is no unlawful intrusion under Article I, section 9. *See*, *e.g.*, *State v. Brown*, 348 Or 293, 305, 232 P3d 962 (2010) ("Beal's consent to a search relinquished the remaining privacy interest in the room and its contents."); *see also State v. Tanner*, 304 Or 312, 322, 745 P2d 757 (1987) ("B's section 9 interests will not be violated if A allows the police

to enter the house and discover the effects, * * * because A controls access to the house * * *.").

When the state relies on consent, it must prove by a preponderance of the evidence that "someone having the authority to do so" voluntarily gave the police consent to search the defendant's property and that any limitations on the scope of the consent were complied with. *Weaver*, 319 Or at 219. Where, as in this case, the police rely on consent from someone other than the defendant, it is necessary to establish the basis of the third party's authority. As an example of valid authority, a co-inhabitant with common authority over property, based on joint access or control, generally has authority to give consent to search the property. *State v. Carsey*, 295 Or 32, 41, 664 P2d 1085 (1983).[3]

Before the Court of Appeals, defendant argued that, to satisfy the requirements of the consent exception under Article I, section 9, consent must be given by a person with actual authority to give it. As pertinent here, defendant argued that Bull lacked authority to consent to a search of the wooden box because she did not have common access to or control over it. In its brief before the Court of Appeals, the state did not challenge the analytical framework that defendant had advanced. Rather, the state acknowledged that, under the Court of Appeals' case law interpreting Article I, section 9, the existence of valid consent depends on the consenter's actual authority. The state also acknowledged that the existence of such authority depends on whether the consenting person has joint access to and control over the property in question. However, the state disagreed with defendant's application of those principles to the evidence in this case. The state insisted that, because no evidence in the record suggested any limitation on Bull's authority over the shared bedroom and its contents, Bull had actual authority to consent to the search that the officers conducted.

---

[3] In *Carsey*, this court explained that:

"[C]ommon authority rests on mutual use of property by persons generally having joint access or control for most purposes so that it is reasonable to recognize that any of the co-inhabitants has the right to permit inspection in his own right, and that the others have assumed the risk that one of their number might permit the common area to be searched."

*Id.*

Focusing on Article I, section 9, the Court of Appeals hewed to the issue that the parties appeared to agree was dispositive—whether the consents on which the state relied had been given by persons with actual authority to consent, as determined by the rights of access to and control over the property that those persons held. The court held that, at least with respect to the search of the wooden box, the evidence did not support a determination that Bull had actual authority to give consent. The court reasoned that, although Bull had joint access to and control over the shared bedroom where the wooden box was located, there was no evidence that she had joint access to or control over the box itself, or that defendant had authorized or acquiesced in its use by any person other than herself. 267 Or App at 344-46. Accordingly, the Court of Appeals held that the warrantless search of the box was unlawful and that the fruits of that search must be suppressed. It also concluded that defendant's consent to the further search of the bedroom, given when she was confronted with the results of the search of the box, was the "unattenuated product[] of the unlawful search" and that, consequently, the items found in that further search also must be suppressed. *Id.* at 346.

When the state sought review of that decision by this court, it advanced a revised theory as to why there was lawful consent to the warrantless search of the wooden box for purposes of Article I, section 9. Abandoning the theory that Bull had had actual authority to consent to a search of the box, the state argued that the search was justified by what it described as "the apparent authority doctrine." Under that doctrine, which was adopted by the United States Supreme Court in *Illinois v. Rodriguez*, 497 US 177, 188-89, 110 S Ct 2793, 111 L Ed 2d 148 (1990), a police officer who conducts a search based on consent given by a person that the officer reasonably—but mistakenly—believes has authority to consent, does not violate the Fourth Amendment prohibition against unreasonable searches. The primary question that the state posed on review was whether that apparent authority doctrine is cognizable under the consent exception to the warrant requirement under Article I, section 9.

A preliminary issue, not raised by the parties, is whether the state's failure to advance that theory before the trial court and the Court of Appeals precludes the state from relying on it before this court as a basis for upholding the trial court's ruling on defendant's motion to suppress. We conclude that it does not. Here, the parties' specific legal theories pertaining to consent were never clearly laid out in the trial court. Granted, the state did not advance an apparent authority theory of consent before the Court of Appeals. However, as articulated in both its petition for review and its merits brief before this court, the state continued to argue that the evidence before the trial court satisfied the consent exception under Article I, section 9. Moreover, it likely would have been futile for the state to raise a consent-based apparent authority theory before the Court of Appeals, because that court previously had held that only actual authority can satisfy the consent exception. *See, e.g.*, *State v. Fuller*, 158 Or App 501, 505, 976 P2d 1137 (1999) (holding that consent, for purposes of Article I, section 9, must be given by a "person with the actual authority to do so"); *State v. Ready*, 148 Or App 149, 152-53, 939 P2d 117, *rev den*, 326 Or 68, 950 P2d 892 (1997) (same). As a practical matter, the state was in a poor position to make its consent-based apparent authority argument to any Oregon tribunal other than this court, which has not directly addressed that issue. Accordingly, and in the absence of any argument by defendant that she has been prejudiced by the state's revised theory of consent, we choose to exercise our discretion to consider it.

As noted, the apparent authority doctrine that the state asks us to recognize is closely associated with *Rodriguez*, a Fourth Amendment case decided some 25 years ago by the United States Supreme Court. In that case, a woman who had lived for a time with the defendant in his apartment, but who had moved out a month earlier, used a key that she had taken without the defendant's knowledge to let police officers into the apartment. After entering the apartment, the officers observed drugs in plain view. As a consequence, the defendant was charged with unlawful possession of a controlled substance. The defendant moved to suppress the evidence, and the trial court granted the motion after concluding that the warrantless entry into the

apartment violated the Fourth Amendment. *Id*., 497 US at 179-80. Before the Supreme Court, the state argued that, because the police officers reasonably believed that they had entered the apartment with the consent of a co-tenant,[4] there had been no Fourth Amendment violation. *Id*. at 182.

The Court agreed with the state. The Court began its analysis by noting that the Fourth Amendment is a guarantee only against "unreasonable" searches and that a co-tenant's consent to the search of a residence can make a warrantless search "reasonable." *Id*. at 183-84. The Court then observed that, in several prior decisions dealing with other factors that had been found to render a warrantless search "reasonable," it had concluded that the Fourth Amendment does not demand literal factual accuracy, but only that any mistake of fact be reasonable in light of the facts available to the police at the time of the search. *Id*. at 184-85 (discussing *Maryland v. Garrison*, 480 US 79, 107 S Ct 1013, 94 L Ed 2d 72 (1987); *Hill v. California*, 401 US 797, 91 S Ct 1106, 28 L Ed 2d 484 (1971); and *Brinegar v. United States*, 338 US 160, 69 S Ct 1302, 93 L Ed 1879 (1949)). The Court saw no reason to depart from that "general rule" with respect to the factual determination of consent:

> "As with other factual determinations bearing on search and seizure, the determination of consent to enter must be judged against an objective standard: would the facts available to the officer at the moment warrant a man of reasonable caution in the belief that the consenting party had authority over the premises. *** [I]f so, the search is valid."

*Rodriguez*, 497 US at 188-89 (internal quotation marks omitted).[5]

This court has never specifically decided whether the Fourth Amendment "apparent authority" doctrine

---

[4] In her conversations with the police, the woman had referred to the apartment as "our apartment."

[5] The dissent in *Rodriguez* argued that the "reasonableness" balance already had been struck *against* warrantless home intrusions, except for exigent circumstances, and that "reasonable" factual errors by law enforcement officers could not validate a search that already was inherently unreasonable. Accordingly, the dissent concluded, "the reasonableness of a police officer's mistaken belief that a third party had authority to consent is irrelevant." 497 US at 196 (Marshall, J., dissenting).

comports with the consent exception to the warrant requirement under Article I, section 9.[6] In urging us to conclude that it does, the state points to the "substantive[] similar[ity]" between Article I, section 9, and the Fourth Amendment that this court recognized in *State v. Fair*, 353 Or 588, 602, 302 P3d 417 (2013). Like the federal provision, the state observes, Article I, section 9, does not protect against *every* search or seizure by the government, but only against those that are arbitrary, oppressive, or otherwise "unreasonable." *Id.* The state contends that a corollary to that focus is evident in this court's Article I, section 9, jurisprudence: Not all factual mistakes by government actors about the circumstances surrounding a search—but only those that are unreasonable—render the search unlawful under Article I, section 9.

That principle was decisive, the state argues, in *State v. Holdorf*, 355 Or 812, 333 P3d 982 (2014), where this court held that, under Article I, section 9, a police officer lawfully could stop a person based on "reasonable" suspicion that the person has committed a crime, as long as that suspicion was based on specific and articulable "facts" that had been conveyed to the officer by someone the officer could reasonably rely on. Similarly, the state notes, in *State v. Baker*, 350 Or 641, 260 P3d 476 (2011), this court held that a police officer's objectively reasonable belief that an emergency existed was sufficient to trigger the emergency aid exception to the warrant requirement, even though no emergency existed in fact. The state argues for a similar analysis of warrantless searches under Article I, section 9's, consent exception. In the state's view, the lawfulness of a consent search should be assessed—similarly to the analysis in *Rodriguez*—based on the facts available to the police

---

[6] In *Carsey*, this court held that the consent exception under the Fourth Amendment, as it was interpreted at that time*,* did not extend to circumstances in which the police had a mistaken, but reasonable, belief that a person with authority had consented to the search. 295 Or at 44-46. *Carsey* notwithstanding, as discussed above, the Court with the last word on Fourth Amendment questions adopted the apparent authority doctrine some seven years later, in *Rodriguez*. This court also implied in *Carsey* that actual authority is required to satisfy the consent exception under Article I, section 9, but it did not specifically decide that issue. *See* 295 Or at 34 n 1. *See State v. Guggenmos*, 350 Or 243, 265 n 4, 253 P3d 1042 (2011) (Kistler, J., dissenting) (so describing import of *Carsey*).

at the time of the search, with the focus on whether a reasonable person, armed with those facts, would have believed that the consenting person had authority over the property to be searched.

There are two overlapping problems with that approach, both of which stem from the fact that the Fourth Amendment doctrine of apparent authority is based on different principles than those underlying the consent exception under Article I, section 9. First, as discussed, the federal doctrine is premised on the Fourth Amendment precept that a reasonable mistake of fact as to the existence of authority to consent does not render a warrantless search invalid. *See Rodriguez*, 497 US at 184-86. Under that conception of apparent authority, it is immaterial whether the true owner of property authorized (or even appeared to authorize) a third party to consent to search the property. That is, the reasonableness of a factual mistake as to the consenter's authority does not depend on any objective manifestation by the true owner; in fact, the police may not even know of the existence of the true owner.[7]

In contrast, because consent under Article I, section 9, involves the relinquishment of a privacy interest, *Brown*, 348 Or at 305, it must be given by (or lawfully on behalf of) the person who holds the protected privacy interest. *See Weaver*, 319 Or at 219 (consent must be given by someone "having the authority to do so."). For that reason, the existence of valid third-party consent depends either on the third party's common authority over the property based on her or his own property interest, *Carsey*, 295 Or at 46, or, alternatively, on the application of agency principles.[8]

---

[7] Thus, under the Fourth Amendment analysis, "apparent authority"—which ordinarily is associated with agency law principles—is unrelated to the law of agency. *See, e.g.*, *United States v. Moran*, 214 F3d 950, 951 (8th Cir 2000) (declining to "pursue the intricacies of property and agency law" when the decisive question under *Rodriguez* "is whether the search was 'unreasonable' within the meaning of the Fourth Amendment"); *State v. Morse*, 156 Wash 2d 1, 12 n 3, 123 P3d 832 (2005) (noting that "apparent authority," as used under Fourth Amendment, "is quite different than 'apparent authority' as used in agency law," where "apparent authority stems from the principal's objective manifestation to a third party").

[8] When this court implied in *Carsey* that actual authority is required to satisfy the consent exception under Article I, section 9, 295 Or at 34 n 1, it was considering the sort of actual authority that is based on joint access and control

Second, and relatedly, the state's argument fails to recognize that, under Article I, section 9, consent always has been treated differently from other recognized justifications for warrantless searches, including, for example, justifications that are based on an exigency that makes obtaining a warrant infeasible. When an exigency-based exception applies, the lawfulness of a search depends on what a reasonable person would make of the facts known to the officer at the time of the search. Unlike a consent search, what the defendant intended or what authority he or she had is not part of that inquiry.

When the police rely on an exigency-based exception to the warrant requirement, they are exercising the government's unilateral authority to intrude on a person's protected property interests, as they do when executing warrants.[9] Because a cognizable exigency makes obtaining

_____

over property. *Id.* at 44-45. As the Fourth Circuit has recognized, however, in theory, "third person authority could be derived from an actual agency relationship." *United States v. Block*, 590 F2d 535, 539 n 5 (4th Cir 1978). The court in *Carsey* did not discuss agency-based actual authority, nor did it contrast such authority with the agency-based doctrine of apparent authority, which, unlike the Fourth Amendment doctrine adopted in *Rodriguez*, requires the "holding out" of an apparent agent by a principal. *See Eads v. Borman*, 351 Or 729, 736, 277 P3d 503 (2012) (endorsing settled common-law agency principle that "[a]pparent authority to do any particular act can be created *only by some conduct of the principal which*, when reasonably interpreted, causes a third party to believe that the principal consents to have the apparent agent act for him on that matter" (emphasis added)). Under agency principles, irrespective of whether the agency is apparent or actual, the action taken by the agent also must be one that was within the scope of the agent's actual or apparent authority. *Id.* at 736 n 4.

Because the Fourth Amendment doctrine of apparent authority is not anchored on an agency-based theory of consent, and because the state in this case does not contend that defendant engaged in any conduct that would have caused a reasonable person to believe that she had authorized Bull to consent to a search of the wooden box, we need not reach the issue of whether agency-based apparent authority would suffice to satisfy the consent exception under Article I, section 9.

[9] The quintessentially "reasonable" way to establish the government's authority to conduct a nonconsensual search is through issuance of a warrant from a neutral and detached magistrate, on a showing of "probable cause." *State v. Anspach*, 298 Or 375, 380-81, 692 P2d 602 (1984). Of necessity, the probable cause showing is based on the facts as the person applying for the warrant—usually a police officer—understands them at the time of the application. Because the probable cause decision is predictive, the most that can be expected is that the decision be reasonable in light of the facts that are known to the government actor. Therefore, facts that would support a magistrate's determination of probable cause must "lead a *reasonable* person to believe that seizable things will probably be found in the location to be searched." *Id.* Of course, a motion to controvert

a warrant infeasible, it is the police officer, not a neutral magistrate, who initially must decide whether the search is justified. But the officer's decision is made and reviewed under the same standard that would have applied if a magistrate had made it: Based on the facts known to the officer at the time of the search, would a reasonable person have believed that (1) seizable things would probably be found; and (2) circumstances constituting an exigency were present? *See, e.g.*, *State v. Miskell/Sinibaldi*, 351 Or 680, 696, 277 P3d 522 (2012) (illustrating point). If so, the officer's unilateral exercise of authority is lawful, even if, in hindsight, that assessment turned out to be wrong. As with searches authorized by a warrant, the relevant temporal reference point for assessing the lawfulness of a warrantless search is when the search was conducted.[10]

Thus, in *Stevens*, this court held that police officers lawfully had entered and searched the defendant's residence under the exigent circumstances exception to the warrant requirement because they had probable cause to believe that kidnapped children could be found in the residence and that those children might be in immediate danger. 311 Or at 129. Likewise, in *Miskell*, this court focused on the circumstances known to police officers when they decided to proceed with a warrantless recording of suspect statements to determine whether it was objectively reasonable to believe that swift action was necessary to prevent the destruction of evidence.

---

allows a defendant to challenge the "good faith, accuracy and truthfulness of the affiant." ORS 133.693(2). However (and subject to the defendant's ability to controvert), even if it later turns out that the factual circumstances were not as the affiant believed them to be, the magistrate's determination of probable cause and issuance of a warrant remain valid, and any search performed under the authority of the warrant is lawful. *See State v. Esplin*, 314 Or 296, 305, 839 P2d 211 (1992) (relevant time for determining probable cause is when police officer seeks warrant).

[10] As Professor LaFave has explained:

"It is axiomatic that hindsight may not be employed in determining whether a prior arrest or search was made upon probable cause. If the action was taken without a warrant, the information to be considered is the 'totality of the facts' available to the officer at the time of the arrest or search; if it was pursuant to warrant (of which the arresting officer must have been aware), then the information to be considered is that which was made available to the issuing magistrate before the warrant was issued, including reasonable inferences drawn by the affiant."

William R. La Fave, *Search and Seizure* § 3.2(d), 57-60 (5th ed 2012 & Supp 2014).

351 Or at 696-99. Indeed, as the state points out, this court has used a standard of objective reasonableness, based on the facts known to police at the time of a search, when reviewing the lawfulness of warrantless searches based on the emergency aid exception, *Baker*, 350 Or at 649; the officer safety exception, *State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987); and the school safety exception, *State ex rel Juv. Dept. v. M. A. D.*, 348 Or 381, 392-93, 233 P3d 437 (2010); in addition to the more general "exigent circumstances" exception at issue in *Stevens* and *Miskell*.

In contrast, as discussed, a consent search is justified only if someone who had authority gave consent, *Weaver*, 319 Or at 219; the existence and scope of that authority could depend on facts that were unknown to the police at the time of the search. Although not directly on point, this court's decisions addressing the voluntariness requirement are consistent with that understanding in requiring consideration of the totality of circumstances, including facts not known to the police at the time of the search.

For example, in *State v. Kennedy*, 290 Or 493, 502, 624 P2d 99 (1981), this court stated that

> "the proper test for determining the validity of consent to a search is to examine *the totality of the facts and circumstances* to see whether the consent was given by defendant's free will or was the result of coercion, express or implied."[11]

(Emphasis added.) In *Kennedy*, police officers approached the defendant as he was leaving the Portland airport and told him that they had information suggesting that he might be carrying drugs in his luggage (the information, based on a drug smugglers' profile, was insufficient, in itself, to provide probable cause to search the defendant). *Id.* at 495-96. The defendant denied that he was carrying drugs and, without any questions from the officers, asked them if they would like to search his luggage. The officers searched his bag and

---

[11] The court in *Kennedy* did not direct its analysis specifically to Article I, section 9, but noted that the statutory rights that the defendant had invoked involved "substantially the same *** analysis" as the analysis under Article I, section 9 and the Fourth Amendment. 290 Or at 497. However, this court has since recognized the "totality of the circumstances" analysis in *Kennedy* as the correct test for determining the voluntariness of consent under Article I, section 9. *See, e.g.*, *State v. Unger*, 356 Or 59, 72, 79-80, 333 P3d 1009 (2014).

found a vial that was empty inside but which had a small amount of cocaine residue along its threads. *Id*. In the defendant's ensuing prosecution on drug charges, the trial court suppressed that evidence. On review, the question before this court was whether the warrantless search of the bag was justified under the consent exception—more particularly, the question was whether the defendant's consent to the search of the bag had been voluntary, rather than the result of police coercion.

After examining the totality of the factual circumstances, this court concluded that the encounter was not coercive. Notably, among the facts that the court mentioned was one that would not have been known to the police at the time of the search—the fact that the only evidence the police would find in the bag was an empty glass vial that, when examined closely, revealed a residue of cocaine on its threads. The court explained that

> "[d]efendant may well have invited the search in the belief that no incriminating evidence would be found. Other courts have held that circumstances indicating that the consenting party believed no incriminating evidence would be found in a search are a proper factor for consideration in determining whether consent to the search was voluntary."

*Id.* at 505-06.

In *Stevens*, this court also considered the totality of the circumstances, including facts that were unavailable to the police at the time of the search, in reviewing a trial court's determination that the defendant's consent to a warrantless search of his home had been voluntary. The defendant in *Stevens* was arrested on a winter day, standing by a creek, soaking wet, and wearing only jeans and socks. Although he initially seemed to be physically and mentally impaired, he appeared to recover once the police took him to the county jail and gave him dry clothes, coffee, and cigarettes. Detectives began to interview the defendant at around 10:00 a.m. and, according to their testimony, he did not appear to be under the influence of drugs at that time. During the interview, the defendant told the detectives that he had injected methamphetamine three times during the previous night and that, at 3:00 a.m., he had injected the

remaining "scraps" of the drug. The detectives sought defendant's consent to search his home for evidence of the crimes for which he had been arrested; they explained that he could refuse and informed him that any evidence discovered could be used against him. The defendant told the detectives that he understood and signed a consent form. Several hours later, toward the end of the interview, the defendant affirmed that he had given his statements "knowingly, voluntarily and intelligently," and he attributed his earlier impairment to hypothermia. 311 Or at 133-34.

In his ensuing prosecution, the defendant moved to suppress evidence discovered in the search of his home on the ground that, due to drug intoxication, his consent had not been knowing and voluntary. At the hearing on the motion, among other evidence, the trial court received testimony from a criminologist who had found methamphetamine in a sample of the defendant's urine taken after his interview, the testimony of a psychiatrist who had reviewed a tape of the interview and who opined that the defendant had not been capable of consenting voluntarily at the time, and the testimony of witnesses who had seen the defendant in the hours before his arrest. Based on its consideration of the totality of the circumstances, the trial court determined that the defendant had voluntarily consented to the search and therefore denied suppression. *Id*. at 135-36. In affirming that decision, this court specifically approved the trial court's consideration of all the evidence:

> "The trial court's findings are supported by evidence, which we have summarized above. * * * The trial court specifically found after examining the evidence with particular concern about the issue, that defendant's drug use did not impair his capacity to make a knowing, voluntary and intelligent choice. We hold that the trial court did not err in concluding from its findings that defendant's consent to search * * * w[as] given voluntarily."

*Id*. at 136.

*Weaver* involved the scope of a consent search. In that case, the owner of a secondhand store consented in writing to a warrantless search of his store for firearms and other regulated property. Unbeknownst to the owner, before

he signed the consent form, other police officers already had started to search and seize items from the store. The owner was charged with crimes based on evidence found in the search. At trial, he moved to suppress the evidence seized in the search on the ground that the consent form that he had signed did not authorize the warrantless search that occurred *before* his consent was given. The trial court granted the motion. 319 Or at 214-17.

On review, this court concluded that the "true" issue before it was the scope of the defendant's consent, that is, whether the defendant retroactively had consented to a search. Although the state did not propose a police-centric view of consent such as the one it advocates here, it did propose a categorical rule that consent should be deemed retroactive as a matter of law. In rejecting that argument, this court explained:

> "The scope of a consent is to be determined by the consenting party. It is possible for a consent to 'relate back' to the beginning of a search or seizure that otherwise would be unlawful. For a consent to conduct a search retroactively to validate earlier police activity, however, there must be evidence that the person giving the consent intended the consent to be retroactive. In this case, there is no evidence in the record indicating that [the] defendant intended his consent to be retroactive."

*Id.* at 221-22.

Because they involved the issues of voluntariness and scope of consent, rather than authority to give consent, the discussed cases are not directly on point here. However, they are inconsistent with the premise that the validity of consent can be controlled by what the police reasonably but mistakenly believe based on facts available to them when they decide to search. Instead, in determining whether the person giving consent both voluntarily consented and—by parity of reasoning—had authority to do so, the court must consider the totality of circumstances, including facts that may not have been available to the police when the decision to search was made. Because the state adduced no evidence in this case that Bull had authority to consent to the search

of defendant's wooden box, the evidence was insufficient to satisfy the consent exception under Article I, section 9.

We turn to the state's final argument, advanced for the first time in oral argument before this court, that we should adopt an interpretation of Article I, section 9, that is "regrounded" in the wording of the provision: "No law shall violate the right of the people to be secure in their persons, houses, papers and effects against *unreasonable* searches and seizures." (Emphasis added). Based on the text of the provision, the state argues that the question of constitutionality reduces to the determination of whether a search was "unreasonable," without regard to whether a recognized exception to the warrant requirement permitted the search. The state contends that, under that analysis, the searches at issue in this case were lawful because the police reasonably believed that they had permission to search from people with authority to consent.

As with the consent-based theory discussed above, the state did not advance its "reasonableness" theory either in the trial court or in the Court of Appeals. As discussed, 358 Or at 482-83, that fact, standing alone, would not necessarily and automatically preclude this court from considering such a theory. This court sometimes has been willing to consider entirely new proposed interpretations of a constitutional provision that were presented for the first time on review. *See, e.g.*, *State v. Ciancanelli*, 339 Or 282, 121 P3d 613 (2005) (considering proposed new interpretation of Article I, section 8, that was not raised in trial court or Court of Appeals); *Stranahan v. Fred Meyer, Inc.*, 331 Or 38, 11 P3d 228 (2000) (considering party's request to overrule court's prior interpretation of Article IV, section 1, of Oregon Constitution raised for first time on review). The circumstances here may be distinguishable, however, because in this case the state raised its theory for the first time at oral argument, when there was little opportunity for defendant to formulate a considered response.

We need not decide that question. Even assuming *arguendo* that it is appropriate to consider the state's "reasonableness" theory when it was not raised until oral argument, we decline to do so, because it is insufficiently

developed to justify our reconsideration of longstanding precedent with which it is at odds. In particular, as noted, 358 Or at 480, this court has adopted a categorical view under Article I, section 9, that deems warrantless searches to be *per se* unreasonable (subject to certain well-defined and limited exceptions). *See*, *e.g.*, *Bridewell*, 306 Or at 235. The state proposes to set aside that categorical approach in favor of one that asks, instead, whether an officer acted unreasonably in conducting a search, in light of the circumstances known to the officer and without regard to the existence of a warrant.

        This court has expressed its willingness to reconsider a prior interpretation of the Oregon Constitution "whenever a party presents to us a principled argument suggesting that, in an earlier decision, this court wrongly considered or wrongly decided the issue in question." *Stranahan*, 331 Or at 54. But we also have observed that the path to overturn established constitutional precedent is not an easy one:

> "[T]he principle of *stare decisis* means that the party seeking to change a precedent must assume responsibility for affirmatively persuading us that we should abandon that precedent.
>
> "Various considerations may add to that responsibility. The most common such consideration is time. Many decisions of this court serve as precedent in later decisions. Thus, disavowing one case may undermine the precedential significance of several others.
>
> "* * * * *
>
> "[Thus] the state, in order to prevail in this case, must persuade us, first, that the constitutional rule that it attacks was not formulated either by means of the appropriate paradigm or by some suitable substitute. If the state accomplishes that task, then it still has before it the more difficult task of persuading this court that application of the appropriate paradigm establishes that the challenged constitutional rule is incorrect. Finally, and assuming that it is able to convince us of the incorrectness of the challenged rule, the state must persuade us that, when the passage of time and the precedential use of the challenged rule is factored in, overturning the rule will not unduly cloud or complicate the law."

*Ciancanelli*, 339 Or at 290-91; s*ee also* [State v. Unger](#), 356 Or 59, 70, 333 P3d 1009 (2014) (describing same burden).

The state's argument, which primarily consists of a general appeal to the wording of Article I, section 9, falls short of that standard for reconsideration of constitutional precedent because it does not meaningfully reckon with this court's prior jurisprudence discussed above. Under those circumstances, we decline the state's invitation to reconsider our interpretive paradigm under Article I, section 9, in this case.

To summarize: We reject the state's argument that the officers' warrantless search of the wooden box owned by defendant was justified under the consent exception to the warrant requirement of Article I, section 9. In addition, we decline to consider the state's alternative argument, raised for the first time during oral argument on review, that the searches at issue in this case were lawful because, even though they were conducted without a warrant and did not satisfy a recognized exception to the warrant requirement under Article I, section 9, they nonetheless were reasonable. It follows that the trial court erred in denying defendant's motion to suppress the evidence obtained in the search of the wooden box, and that the Court of Appeals correctly reversed that decision.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

**LANDAU, J.,** concurring.

At issue in this case is the lawfulness of a police officer's warrantless search based on a reasonable, but mistaken, belief that consent to search had properly been granted. Doctrinally, the search could be regarded as lawful under any of at least three different theories. First, it could be that the search qualified under the consent exception to the warrant requirement of Article I, section 9, of the Oregon Constitution. Second, this court could recognize a separate exception to the warrant requirement that applies to the circumstances of this case. Or third, the court could abandon its preference for warrants altogether

and evaluate each police action on a case-by-case basis for reasonableness.

As I understand it, the state preserved only the first contention, and the court rejects it. I join in the court's opinion. I write separately to emphasize that the other two arguments have not properly been presented to us, and the court's opinion should not be read as if it has implicitly addressed them. It has not.

The first of those two arguments is that this court should recognize an exception to the general rule that, to be reasonable, a search must be supported by a properly obtained warrant. As I understand it, the state did not make that argument in this case.

The argument would go something like this. The text of Article I, section 9, does not guarantee a right to be free from all searches except those to which a person consents. Rather, it guarantees a right to be free from *unreasonable* searches. *See [State v. Guggenmos](#)*, 350 Or 243, 257 n 6, 253 P3d 1042 (2011) (the "touchstone" of Article I, section 9, is "reasonableness"). We presume that warrantless searches are unreasonable, but we recognize exceptions to that general rule. *See, e.g., [State v. Mazzola](#)*, 356 Or 804, 810, 345 P3d 424 (2015) ("[A] search conducted without a warrant is deemed unreasonable unless it 'fall[s] within one of the few specifically established and carefully delineated exceptions to the warrant requirement.'" (Quoting *State v. Bridewell*, 306 Or 231, 235, 759 P2d 1054 (1988).)). Each of those exceptions is based upon the judgment of this court that, in specified circumstances, proceeding without a warrant nevertheless is reasonable.

For example, the officer-safety exception is grounded in the determination that it is reasonable for officers to check for weapons in circumstances presenting a threat of imminent harm. *See, e.g., State v. Bates*, 304 Or 519, 524-25, 747 P2d 991 (1987) ("Our inquiry therefore is limited to whether the precautions taken were reasonable under the circumstances as they reasonably appeared at the time that the decision was made."). Similarly, the emergency-aid exception is predicated on the court's determination that in certain circumstances—those in which it appears that it is

necessary to render immediate aid or assistance to someone in imminent threat of serious harm—officers may engage in conduct that might otherwise violate Article I, section 9, because it is reasonable to do so. *State v. Baker*, 350 Or 641, 649, 260 P3d 476 (2011) ("[W]e conclude that an emergency aid exception to the Article I, section 9 warrant requirement is justified when police officers have an objectively reasonable belief, based on articulable facts, that a warrantless entry is necessary to either render immediate aid to persons, or to assist persons who have suffered, or who are imminently threatened with suffering, serious physical injury or harm." (Footnotes omitted.)).

When an officer has been given consent to search by a person with apparent authority to grant it, and the circumstances present no good reason for the officer to doubt the authority of the consenting party to do so, it certainly could be argued that the officer acts reasonably in accepting the consent and proceeding with a search. In fact, the United States Supreme Court and appellate courts in at least a dozen states have so held.[1] And I confess that I am hard pressed to understand what makes an officer's search under those circumstances unreasonable.

It is not that unusual for the court to recognize new exceptions to the warrant requirement. We did it a few short years ago in *Baker*, in which we expressly recognized what we had implicitly held in a few earlier cases: namely, an emergency-aid exception to the warrant requirement of Article I, section 9. 350 Or at 649. So the fact that there is no current exception covering the police conduct in this case is not dispositive.

---

[1] *Illinois v. Rodriguez*, 497 US 177, 188-89, 110 S Ct 2793, 111 L Ed 2d 148 (1990); *People v. Hopkins*, 870 P2d 478, 483 (Colo 1994); *State v. Buie*, 129 Conn App 777, 787, 21 A3d 550, 557 (2011), *aff'd*, 312 Conn 574, 94 A3d 608 (2014); *State v. McCaughey*, 127 Idaho 669, 671-74, 904 P2d 939, 941-44 (1995); *People v. Burton*, 409 Ill App 3d 321, 330-33, 947 NE2d 843, 852-54 (2011); *Lee v. State*, 849 NE2d 602, 610 (Ind 2006); *State v. Chilson*, 38 Kan App 2d 338, 347, 165 P3d 304, 310 (2007); *Commonwealth v. Santos*, 465 Mass 689, 694-95, 991 NE2d 1049, 1055-56 (2013); *State v. Licari*, 659 NW2d 243, 252-54 (Minn 2003); *State v. Reinpold*, 284 Neb 950, 956, 824 NW2d 713, 720 (2013); *State v. Sawyer*, 147 NH 191, 194-96, 784 A2d 1208, 1211-12 (2001); *State v. Maristany*, 133 NJ 299, 305-08, 627 A2d 1066, 1069-70 (1993); *Commonwealth v. Basking*, 970 A2d 1181, 1192-1200 (Pa Super Ct 2009); *State v. Harding*, 282 P3d 31, 39-41 (Utah 2011); *State v. Wantland*, 355 Wis 2d 135, 149-56, 848 NW2d 810, 817-20 (2014).

Adopting such an exception arguably runs afoul of this court's rejection of a more general good-faith exception to the warrant requirement. The court noted precisely that in *State v. Carsey*, 295 Or 32, 44-45, 664 P2d 1085 (1983), when it rejected the proposed exception as a matter of Fourth Amendment doctrine, based on then-existing Fourth Amendment case law. Of course, Fourth Amendment doctrine has changed quite a bit since *Carsey*. Moreover, the same complaint could be leveled against the recognition of any number of existing exceptions to the warrant requirement, which require only that police officers act reasonably under the circumstances, not that they are always correct. The emergency-aid exception, for example, applies "when police officers have an objectively reasonable belief" that immediate aid is required, *Baker*, 350 Or at 649, even if they turn out to have been mistaken.

My point is not to resolve the matter here. My point is that the matter—which the parties did not address in this case—should be fully briefed and argued in an appropriate case.

The second possible argument is more far-reaching. It would entail abandoning the warrant-preference-and-categorical-exception approach to Article I, section 9, in favor of a *post hoc*, case-by-case examination of the reasonableness of police conduct. This is an argument that the state did mention, albeit—as the court correctly concludes—inadequately. At this point, I am skeptical. But it remains an argument worth carefully considering.

The fact is that the court has never explained very well the source of the warrant-preference-and-categorical-exception approach to Article I, section 9. Certainly, the court has never sought to justify the approach in terms of the intentions or understanding of the framers of the constitution.[2] It is likely that the court's approach would have been entirely foreign to the framers of our constitution in

---

[2] Interestingly, the court has applied that interpretive approach to the particularity clause of Article I, section 9. See *State v. Carter*, 342 Or 39, 42, 147 P3d 1151 (2006). But, to my knowledge, it has never applied that approach to the reasonableness guarantee.

the mid-nineteenth century.[3]  In fact, for nearly 100 years, the court abjured any such reading of Article I, section 9, explicitly holding that the law requires courts to examine only the reasonableness of an officer's conduct under the circumstances of each case, without any particular preference for warrants. As this court explained in *State v. De Ford*, 120 Or 444, 452, 250 P 220 (1927), "the possession of the warrant is not the controlling consideration of whether a search is reasonable or unreasonable. An officer armed with a warrant may make an unreasonable search. An officer without a warrant may make a reasonable search."[4]

Only in 1983 did the court adopt its current approach, but—oddly enough in a state that prides itself as a vanguard of state constitutionalism—the only support was a passing citation to a Fourth Amendment decision. *State v. Davis*, 295 Or 227, 237, 666 P2d 802 (1983) (citing *Katz v. United States*, 389 US 347, 357, 88 S Ct 507, 19 L Ed 2d 576 (1967)). In the meantime, the earlier decisions have never been overruled, at least not explicitly.

As I have explained elsewhere, I do not think that the framers' intentions are particularly salient in construing the reasonableness requirement of Article I, section 9.

---

[3] *See, e.g.*, *Rohan v. Sawin*, 59 Mass 281, 284-85 (1850) (upholding constable's warrantless search of premises because constitutional search and seizure provision was intended only to be "in restraint of general warrants to make searches and require[] warrants to issue only upon a complaint made under oath"); *Mayo v. Wilson*, 1 NH 53, 60 (1817) (constitutional search and seizure provision "does not seem intended to restrain the legislature from authorizing arrests without warrant"); *Wakely v. Hart*, 6 Binn 315, 319 (Pa 1814) (warrantless seizure upheld because constitutional search and seizure guarantee "was nothing more than an affirmance of the common law," which permitted arrests without warrants). Nineteenth-century treatises likewise tend to emphasize that constitutional search and seizure guarantees were directed at abuses of general warrants and made no mention of a warrant requirement. *See, e.g.*, Joseph Story, 2 *Commentaries on the Constitution of the United States: With a Preliminary Review of the Constitutional History of the Colonies and States, Before the Adoption of the Constitution* 678-80 (3d ed 1858) (the Fourth Amendment search and seizure guarantee "is little more than the affirmance of a great constitutional doctrine of the common law" requiring warrants to state with particularity the time, place, and nature of the offense).

[4] *See also State v. Lee*, 120 Or 643, 651, 253 P 533 (1927) (upholding constitutionality of warrantless search). As recently as 1959, this court held that the reasonableness of a search does not depend on the presence of a warrant, but on the circumstances of each case. *State v. Hoover*, 219 Or 288, 299, 347 P2d 69 (1959).

*See generally [State v. Hemenway](#),* 353 Or 129, 158-59, 295 P3d 617 (2013) (Landau, J., concurring).   Moreover, I am inclined to think that there are good reasons for an *ex ante* warrant requirement. But, at the very least, this court has some housekeeping to do.

I write only to emphasize that nothing in the court's opinion today addressees either of these doctrinal possibilities. To the contrary, both remain live issues that should be properly raised and fully briefed so that we may give them our careful attention in a future case.

Kistler, J., joins this concurring opinion.