AOYAGI, J.
*423 Defendant appeals his conviction for possession of methamphetamine and felon in possession of a restricted weapon. Late one night, two police offers were parked in a *356 patrol car on Coburg Road in Eugene, watching for two young males on foot who had fled at the sight of a police car approximately a half hour earlier, carrying bulky pillowcases that suggested a possible residential burglary. Defendant rode toward the patrol car on a bicycle. One of the officers stepped out of the patrol car and stopped defendant. He did so for two reasons-because defendant was bicycling without a headlight, which is a traffic violation, and because he suspected defendant of burglary based on defendant "vaguely" matching the description of one of the males seen earlier. The stop lasted six minutes. During the stop, defendant began reaching into his pockets repeatedly. That behavior led the officer to conduct an officer safety patdown, which in turn led to the seizure of a methamphetamine pipe and a butterfly knife. Before trial, defendant moved to suppress that evidence on the ground that, at the time of the patdown, the officer had unlawfully extended a lawful traffic stop to investigate another crime, burglary, without reasonable suspicion. The trial court denied the motion to suppress. Defendant was subsequently convicted. We conclude that the trial court erred in denying the motion to suppress and therefore reverse and remand.
I. STANDARD OF REVIEW
We review the denial of a motion to suppress for errors of law. State v. Ehly , 317 Or. 66, 75, 854 P.2d 421 (1993). In doing so, we are bound by the trial court's express and implicit factual findings, so long as there is constitutionally sufficient evidence in the record to support them. Id . We state the facts in accordance with that standard.
II. FACTS
Around 1:40 a.m. on a December night, Officer Meador drove by two young males standing on the sidewalk at the corner of Coburg Road and Jeppesen Acres Road in Eugene. That area is primarily residential, but there also are businesses up and down Coburg Road. The two young males *424 were carrying pillowcases that appeared to be full of objects, and, upon seeing Meador, they sprinted away. No crimes had been reported in the area, but Meador suspected a possible burglary. On the police radio, Meador described the two suspects and, believing they might be hiding in a backyard in the area, requested that other officers assist in setting up a perimeter to try to locate them. Meador described the two suspects as white males in their late teens or early 20s. He described the first suspect as being of medium build and wearing a black beanie cap, a light grey or white t-shirt, and unknown pants. He did not get a good view of the second suspect and described him only as wearing a "darker jacket or hoody."
Officer Salsbury heard Meador's request and his description of the two young males over the radio. Within one to five minutes of hearing the call, Salsbury parked his patrol car at the corner of Coburg Road and Elysium Street, about a block away from where Meador had seen the suspects. Another officer, Lindsay, was with him in the car.
About thirty minutes later, at 2:14 a.m., Salsbury and Lindsay saw defendant riding a bicycle down Elysium Street toward Coburg Road, directly toward their patrol car. Salsbury thought that defendant "vaguely" matched the description of the second suspect. He was a white male, looked "at a distance at night" like he was "in his 20s," and was wearing "dark clothing."
Salsbury got out of the car and stopped defendant. Salsbury testified that he had two "clear" reasons for stopping defendant, both of which he told defendant immediately. One was that Salsbury thought that defendant matched the description of one of the burglary suspects. The other was that defendant was bicycling without a headlight, which is a traffic violation.[1] According to Salsbury, the stop proceeded as follows. Salsbury introduced himself and told defendant "what was going on in the area." He explained that he had *425 stopped defendant on "suspicion of potentially being [one] of *357 the two subjects that took off in addition to the traffic violation." Salsbury asked defendant for identification, which is standard procedure "for potentially writing a traffic citation," and defendant provided it. After checking defendant's identification, Salsbury "continued to talk to [defendant], explain to him further what was going on and the activity in the area with all the police vehicles."
It was during this time, as Salsbury tried to "explain to [defendant] about the reason for the stop, all the cops in the area, what we were looking for," that defendant began putting his hands into his pockets. The first time, Salsbury told defendant to take his hands out of his pockets for officer safety, and defendant did so. A few seconds later, however, defendant put his hands into his pockets again. Salsbury again told him to remove his hands from his pockets, and defendant did so. Salsbury resumed talking about "the stop and what was going on in the area," only to have defendant reach into his pockets a third time.
Concerned for his safety, Salsbury conducted an officer safety patdown. He felt an object in defendant's pocket that he suspected was a methamphetamine pipe, due to the item's unique shape and his own perception that defendant might be under the influence of controlled substances. Defendant was handcuffed at 2:20 a.m., six minutes after the stop began. Salsbury advised defendant of his rights, questioned him about the contents of his pockets, and ultimately seized a methamphetamine pipe (that later tested positive for methamphetamine) and a butterfly knife from defendant's pockets.
The state charged defendant with possession of methamphetamine, ORS 475.894, and felon in possession of a restricted weapon, ORS 166.270. Before trial, defendant moved to suppress the evidence. He argued that Salsbury had probable cause to stop him for a traffic violation but did not have reasonable suspicion to stop him for burglary. Accordingly, defendant argued, the evidence seized as a result of the unlawful extension of the traffic stop had to be suppressed under Article I, section 9, of the Oregon Constitution, notwithstanding valid officer safety concerns *426 that arose during the unlawful extension. In response, the state argued that there was no extension because Salsbury had reasonable suspicion that defendant had committed burglary or, alternatively, had not yet actually questioned defendant about the burglary at the time of the patdown.
After a hearing, the trial court denied defendant's motion to suppress, ruling that the stop was "a valid stop" that was "based on a traffic infraction" and "was an appropriate scope and duration" being "less than six minutes." Defendant was subsequently convicted, and this appeal followed.
III. ANALYSIS
The issue on appeal is narrow. Defendant concedes that the police had probable cause to stop him for a traffic violation. See State v. Matthews , 320 Or. 398, 402, 884 P.2d 1224 (1994) (stating standard). Defendant also concedes that, when he began reaching into his pockets repeatedly in contravention of Salsbury's orders, that conduct triggered legitimate officer safety concerns and an appropriate officer safety patdown. See State v. Thomas , 276 Or.App. 334, 337, 367 P.3d 537 (2016), rev. den. , 361 Or. 801, 400 P.3d 925 (2017) (stating standard). The only issue that we must resolve is whether defendant was lawfully stopped at the time of the patdown. That question is critical because the officer safety exception to the warrant requirement applies only "during the course of a lawful encounter with a citizen." State v. Rudder , 347 Or. 14, 21, 217 P.3d 1064 (2009) ; State v. Bates , 304 Or. 519, 524, 747 P.2d 991 (1987). Thus, if defendant was lawfully stopped at the time, the exception to the warrant requirement applies and the motion to suppress was correctly denied. Conversely, if the stop had been unlawfully extended, the exception to the warrant requirement does not apply and the motion to suppress should have been granted.[2]
*358 On appeal, the state argues that defendant was lawfully stopped at the time of the patdown for either of two *427 reasons: because the traffic stop was still ongoing, as the trial court implicitly found, or because Salsbury had reasonable suspicion that defendant had committed burglary, an issue that the trial court opted not to address. The state presents these arguments in the opposite order as it did below-its primary argument to the trial court was reasonable suspicion of burglary-because of the trial court's focus on the traffic stop issue. We address each argument in turn, in the order the state presents them on appeal.
We will not address an alternative argument that the state makes for the first time in its answering brief on appeal: that, regardless of the legality of the stop, the evidence is admissible based on the "independent justification" of officer safety concerns or "attenuation." The state has not developed that argument, nor explained how its logic-that as soon as officer safety concerns arise, a patdown is justified, and it no longer matters whether a stop is lawful-is reconcilable with existing case law limiting the officer safety exception to the warrant requirement to "lawful encounters" with citizens. See Rudder , 347 Or. at 21, 217 P.3d 1064 ; Bates , 304 Or. at 524, 747 P.2d 991. In any event, the state did not make that argument to the trial court, so we decline to consider it.[3] See State v. Davis , 286 Or.App. 528, 538, 400 P.3d 994 (2017) (declining to consider attenuation argument raised for first time on appeal).
A. Ongoing Traffic Stop
A traffic stop is a "temporary seizure" that restrains a person's liberty or freedom of movement. State v. Broughton , 221 Or.App. 580, 587, 193 P.3d 978 (2008), rev dismissed , 348 Or. 415, 233 P.3d 818 (2010). Generally, a police officer may not extend a lawful traffic stop to investigate an unrelated crime for which the officer could not stop the person in the first place. In State v. Rodgers/Kirkeby , 347 Or. 610, 227 P.3d 695 (2010), the Supreme Court considered two cases in which officers inquired about unrelated matters during the course of an *428 otherwise lawful traffic stop. In one case, an officer stopped the defendant for a burned-out license plate light and then, without reasonable suspicion of a drug crime, began questioning the defendant about possible drug paraphernalia in his car. Id. at 613-14, 227 P.3d 695. In the other case, an officer stopped the defendant on suspicion of driving with a suspended license and then, without any reason to believe that the defendant had a weapon, began questioning him about weapons. Id . at 614-16, 227 P.3d 695. The court concluded that both of the defendants' motions to suppress should have been granted, explaining,
"Police authority to perform a traffic stop arises out of the facts that created probable cause to believe that there has been unlawful, noncriminal activity, viz ., a traffic infraction. Police authority to detain a motorist dissipates when the investigation reasonably related to that traffic infraction, the identification of persons, and the issuance of a citation (if any) is completed or reasonably should be completed ."
Id. at 623, 227 P.3d 695 (emphasis added). The officers in both cases had all of the necessary information to issue traffic citations and conclude the stops, but instead chose to extend the stops to investigate unrelated matters without reasonable suspicion of criminal activity, so the evidence discovered as a result of the unlawful extensions had to be suppressed. Id . at 630, 227 P.3d 695.
Since Rodgers/Kirkeby , this court has considered the issue of police inquiries into unrelated matters during traffic stops on multiple occasions. At least two clear rules have emerged. First, an officer may inquire about unrelated matters during an "unavoidable lull" in a lawful traffic stop, at least so long *359 as those inquiries do not result in any further restriction of movement. State v. Jones , 239 Or.App. 201, 208, 245 P.3d 148 (2010), rev. den. , 350 Or. 230, 253 P.3d 1079 (2011) (reaffirming unavoidable-lull rule). Second, an officer may not inquire about unrelated matters in conjunction with a lawful traffic stop if doing so extends the length of the stop, even by a brief period, without separate legal justification. State v. Dennis , 250 Or.App. 732, 740, 282 P.3d 955 (2012) ( "regardless of the length of the extension"). Once a traffic stop "is completed or reasonably should be completed," Rodgers/Kirkeby , 347 Or. at 623, 227 P.3d 695, an officer must have reasonable suspicion of the defendant's involvement in a crime to question the defendant about that unrelated matter. Inquiring about unrelated *429 crimes without reasonable suspicion after a lawful traffic stop "should have ended" is unlawful. State v. Hall , 238 Or.App. 75, 83, 241 P.3d 757 (2010), rev. den. , 349 Or. 664, 249 P.3d 1282 (2011).
Turning to the present case, defendant asserts that the traffic stop for the bicycle headlight violation had ended or should have ended by the time officer safety concerns arose, but that Salsbury unlawfully extended the stop to investigate a suspected burglary. The state responds that the trial court found implicitly that Salsbury was still processing the traffic violation when officer safety concerns arose. We agree that, to rule as it did, the court must have found that Salsbury was still processing the traffic violation. On this record, however, such a finding is not supported by any evidence, precluding us from accepting it for purposes of appeal. See State v. Craig , 284 Or.App. 786, 787, 395 P.3d 634, rev. den. , 361 Or. 803, 401 P.3d 1185 (2017) (presuming trial court made implicit findings necessary to its ultimate conclusion).
The only evidence regarding the substance of the stop is Salsbury's testimony.[4] According to Salsbury, at the time defendant began reaching into his pockets, triggering the officer safety concerns and related patdown, Salsbury had finished checking defendant's identification and moved on to talking to him "about the reason for the stop, all the cops in the area, what we were looking for." The only evidence therefore strongly suggests that, at the relevant time, Salsbury was talking to defendant about the suspected burglary (the reason for "all the cops in the area") and the two young males who had fled with bulky pillowcases (who they "were looking for") to lay the foundation for questioning defendant about the suspected burglary.[5] Even if one views Salsbury's testimony more ambiguously, however, it is, at *430 best , inconclusive as to whether Salsbury was still processing the traffic violation or had begun investigating the suspected burglary.
When a defendant moves to suppress evidence discovered in a warrantless search, "the burden is on the state to prove that the warrantless search did not violate a protected interest of the defendant." State v. Pilgrim , 276 Or.App. 747, 750, 369 P.3d 434 (2016) (emphasis in original). In other words, once defendant alleged that he was unlawfully stopped at the time of the patdown, it was the state's burden to prove that he was lawfully stopped. The state failed to do so here, with respect to its theory that the officer was still processing the traffic violation at that time.
This case is analogous to Dennis , 250 Or.App. at 738, 282 P.3d 955. In that case, a police officer stopped the defendant for a jaywalking violation. During the stop, the officer asked the defendant a series of questions unrelated to jaywalking, which led to the seizure of drugs from his pocket. At a subsequent suppression hearing, the officer *360 could not remember whether he asked the defendant those questions during an unavoidable lull in the traffic stop (a 30-second period in which he was awaiting confirmation of the defendant's identification) or after the lull ended. The officer's testimony was the only evidence in the record on this point. Recognizing the state's burden of proof, we held that the state failed to prove that the officer had asked the questions during an unavoidable lull. The state therefore failed to prove that the defendant was lawfully stopped when the questioning occurred, and the trial court erred in denying the motion to suppress.
Similarly, in this case, the state failed to prove that Salsbury was timely processing a traffic violation when officer safety concerns arose. At best, like the evidence in Dennis , the state's evidence was inconclusive as to whether Salsbury was still processing a traffic violation or had moved on to investigating a possible burglary. We note that, even if Salsbury had not made a final decision whether to issue a traffic citation-an issue on which he did not testify-it would not matter. A police officer may not put off deciding whether to issue a citation simply to buy time to inquire *431 about unrelated matters. State v. Nims , 248 Or.App. 708, 713, 274 P.3d 235, rev. den. , 352 Or. 378, 290 P.3d 814 (2012) ("An officer may inquire about unrelated matters if the officer is not in a position to proceed with the investigation of the traffic violations or the issuance of the citation-for example, if the officer is waiting for a driver to provide identification or waiting for the results of a records check-but an officer may not inquire about unrelated matters as an alternative to going forward with the next step in processing the traffic violation, such as the writing or issuing of a citation." (Emphasis, internal quotation marks, and brackets omitted.)).
B. Reasonable Suspicion of Burglary
Given the state's failure to prove that defendant was lawfully stopped for a traffic violation at the time of the patdown, we turn to the state's alternative argument: that, even if Salsbury extended the traffic stop to investigate a potential burglary, the extension was lawful because Salsbury reasonably suspected defendant of burglary. Whether the facts are sufficient to give rise to reasonable suspicion of burglary-and thereby justify extension of the stop-is a question of law that we review for legal error. State v. Braukman , 246 Or.App. 123, 127, 265 P.3d 28 (2011), rev. den. , 351 Or. 675, 276 P.3d 1123 (2012). The trial court declined to reach that issue, due to its disposition, but it was briefed and argued to the trial court. Both parties also have briefed and argued it on appeal, and we agree with the parties that it is appropriate for us to address. If any potentially dispositive fact questions existed, we would remand for the trial court to make those findings and address the alternative ground in the first instance. State v. Lovaina-Burmudez , 257 Or.App. 1, 14, 303 P.3d 988, rev. den. , 354 Or. 148, 311 P.3d 525 (2013). "But we do so only if the evidence, with nonspeculative derivative inferences, is legally sufficient to permit the trial court to endorse the alternative ground. Otherwise, a remand for reconsideration would be gratuitous." Id . Here, as discussed below, the evidence allows for only one result, so remanding for factual findings would serve no purpose.
If an officer extends a lawful traffic stop by beginning to investigate a crime, Article I, section 9, requires the officer to have reasonable suspicion "that the motorist *432 has committed, is committing, or is about to commit that crime." State v. Reich , 287 Or.App. 292, 298, 403 P.3d 448 (2017). Reasonable suspicion includes both a subjective and an objective component. First, the officer must subjectively believe that the person has committed or is about to commit a specific crime or type of crime, based on "specific and articulable facts" identified by the officer. Id . Second, the officer's subjective belief must be objectively reasonable under the totality of the circumstances. Id .
Here, defendant does not challenge Salsbury's subjective belief that defendant had committed a burglary, so the only issue is whether that belief was objectively reasonable under the totality of circumstances. Salsbury relies on certain aspects of defendant's physical appearance (sex, race, age, *361 and clothing), the location, and the time of night as the specific and articulable facts on which his suspicion of burglary was based. We address each in turn.
With regard to physical appearance, Meador described the second burglary suspect over the radio as a white male in his late teens or early 20s wearing a darker jacket or hoody. That is the description that Salsbury had in mind when he stopped defendant. To begin with, we note that description is fairly generic. It does not include the suspect's height, weight, build, hair color, or hairstyle. It does not include any distinguishing characteristics such as tattoos, scars, glasses, or gait. It provides only sex, race, a rough age range, and a minimal description of a single common item of clothing.
Even then, according to Salsbury, defendant only "vaguely" matched the description. Defendant is a white male, age 34. "At a distance at night," defendant appeared to Salsbury to be "in his 20s," but Salsbury notably did not testify that defendant appeared to be in his "early 20s," nor did he testify to defendant's apparent age as he got closer to Salsbury. These are significant details given defendant's actual age, which was 10 to 15 years older than the suspect's description. The state's evidence regarding defendant's clothing is similarly inconclusive. Salsbury testified only that defendant was wearing some type of "dark clothing." There is no evidence that he was wearing a dark jacket *433 or hoodie. There is no evidence that he was even wearing a dark shirt, as opposed to dark pants, or some other unspecified item of "dark clothing."
Putting on evidence that defendant is a white male, who may or may not have matched the age range of the suspect, and who may or may not have been wearing a dark jacket or hoodie, is insufficient to establish objective reasonable suspicion that defendant had committed burglary. We therefore turn to the other facts on which Salsbury relied, which are the location and time of night. The fact that police encountered defendant only a block from where Meador had seen the two young males certainly has some relevance, given the existence of the perimeter. However, mere proximity to a public sidewalk where someone suspicious was seen running a half hour earlier is not enough to detain citizens at large. Coburg Road is a sizable road with businesses up and down it. Also, a public sidewalk where someone suspicious was seen on the move does not have the same significance as a fixed crime scene; that is, generally speaking, subject to specific circumstances, encountering someone a few blocks from a crime scene a few minutes after a crime occurred is the type of proximity fact that is inherently significant, whereas seeing someone in a public place that a suspicious person ran through a half hour earlier has less inherent significance. As for the late hour, it is definitely a relevant circumstance, but it is not unlawful to be out late at night, and the hour alone is not enough to tip the scales in this case.
Based on the totality of circumstances, we conclude that the state failed to prove that Salsbury's suspicion that defendant had committed burglary was objectively reasonable. We are persuaded by a combination of factors. First, as already discussed, Salsbury had heard only a minimal physical description of the second young male over the radio, and defendant matched even that description only "vaguely" and "from a distance." Second, it was apparent to Salsbury that defendant did not match the second young male's over-all description in several regards. He was not carrying a pillowcase or anything suspicious. He was alone, not with another young white male. He was on a bicycle, not on foot.
*434 Third, Salsbury did not know whether anyone had committed a crime. No one had witnessed or reported a burglary. While Meador may have viewed the two young males' conduct as suspicious, the police's uncertainty whether any crime had actually been committed is part of the totality of circumstances as far as the likelihood that anyone, let alone defendant, had committed a burglary. Fourth, defendant rode his bicycle directly toward a police car with two officers sitting inside it. That is the exact opposite of the behavior of the two young males-sprinting away at the sight of a police car-and facially inconsistent with a desire to evade contact with the police.
*362 The state has not identified any case in which we have found reasonable suspicion on comparable facts. The closest case that we have found still involved more compelling facts than those the state put into evidence in this case. In Rudder , 347 Or. at 16, 217 P.3d 1064, the court held that an officer had reasonable suspicion to detain the defendant on suspicion of burglary where the officer encountered the defendant at 4:00 a.m. in close proximity to a house where a burglar alarm was ringing audibly, the defendant was walking away from the direction of the house, the defendant acknowledged the alarm, and the defendant was wearing dark clothing, was sweating profusely, became increasingly nervous talking to the officer, had visible bulges in his pockets, and, when asked what was in his pockets, selectively and furtively removed items. Reasonable suspicion depends on the totality of circumstances and is always highly fact dependent. Here, as in Rudder , a few additional facts might have made the difference in terms of establishing reasonable suspicion. On this record, however, the state failed to meet its burden.
C. Conclusion
The state failed to prove that defendant was lawfully detained at the time officer safety concerns arose. The state therefore cannot rely on the officer safety exception to avoid suppression of the evidence. The trial court erred in denying defendant's motion to suppress.
Reversed and remanded.

The state suggests that the trial court implicitly found that Salsbury only told defendant that he was stopping him for a traffic violation. Salsbury testified repeatedly and unequivocally that he told defendant both reasons for the stop. Finding otherwise was not necessary to the trial court's decision, nor would it be supported by any evidence, so we will not infer such a finding.

Of course, even if the stop was unlawful, defendant was obligated to comply with the officer's orders to stop putting his hands into his pockets. State v. Wilson , 283 Or.App. 823, 828, 390 P.3d 1114, rev. den. , 361 Or. 801, 400 P.3d 925 (2017). That is a different question than whether evidence found during the officer safety patdown must be suppressed as the fruit of an unlawful stop.

The state did not argue attenuation to the trial court, and it only argued that the patdown was justified by officer safety concerns in the context of arguing that the stop was lawful. While the state now claims to have argued officer safety concerns as an "independent" justification, it provides no record citation to support that assertion, and we have found no such argument in its briefing or argument to the trial court.

Lindsay stayed in the patrol car until after the patdown. At the suppression hearing, Lindsay corroborated some minor points of Salsbury's testimony, such as the fact that defendant biked directly toward the patrol car, but his only testimony about Salsbury's and defendant's verbal interaction was that he heard Salsbury tell defendant to take his hands out of his pockets.

The state suggests that if Salsbury was talking to defendant about the suspected burglary to lay foundation to question him about it, but had not actually asked a question yet, that would not be an extension. That argument is misplaced. What matters is whether Salsbury decided to pursue a burglary investigation in lieu of concluding the traffic stop, not his specific approach to the burglary investigation.