Argued and submitted August 17, 2018, resubmitted en banc January 15; reversed and remanded July 1, 2020

In the Matter of H. K. D. S.,
a Youth.
STATE OF OREGON,
*Respondent,*

*v.*

H. K. D. S.,
*Appellant.*

Yamhill County Circuit Court
16JU03447; A163158

469 P3d 770

In this delinquency proceeding, youth, age 12, was found to be within the juvenile court's delinquency jurisdiction for acts that, if committed by an adult, would constitute first-degree sexual abuse, ORS 163.427. That finding was based, in part, on evidence that seminal fluid containing DNA matching youth's was found on underwear belonging to youth's four-year-old stepsister. Officers made the DNA match after obtaining—without a warrant but with signed parental consent forms—a buccal swab from youth. Before the hearing, youth moved to suppress the DNA evidence obtained through the buccal swab. He argued that the collection of the DNA was both an unconstitutional search and seizure under Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution because officers did not obtain a warrant and, in youth's view, no exception to the warrant requirement applied. In particular, youth contended that he did not consent to the search and, further, that the consent of third parties—in this case, his parents—cannot authorize officers to search a child's person in the context of a criminal investigation. The juvenile court denied youth's motion to suppress. On appeal, youth assigns error to that denial, renewing his arguments below. *Held*: The juvenile court erred in denying youth's motion to suppress the DNA evidence obtained by the buccal swab, and that error was not harmless. Youth merely acquiesced in the search and did not consent to it for purposes of Article I, section 9. Furthermore, under Article I, section 9, parental consent alone does not permit law enforcement to search the person of a child suspected of a crime for DNA.

Reversed and remanded.

En Banc

Ronald W. Stone, Judge.

Christa Obold Eshleman argued the cause and filed the briefs for appellant.

Jonathan N. Schildt, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Egan, Chief Judge, and Armstrong, Ortega, DeVore, Lagesen, Tookey, DeHoog, Shorr, James, Aoyagi, Powers, Mooney, and Kamins, Judges.

LAGESEN, J.

Reversed and remanded.

Tookey, J., concurring in part, dissenting in part.

**LAGESEN, J.**

Does Article I, section 9, of the Oregon Constitution permit law enforcement officers investigating a crime to obtain a DNA sample from a juvenile suspect without a warrant if the child's parents consent to the search but the child does not? If it does, does the Fourth Amendment to the United States Constitution do the same? We took this case into full court to consider those important questions. We conclude that parental consent is not an exception to Article I, section 9's otherwise-applicable warrant requirement for the search of a person for DNA evidence in the course of a criminal investigation. As we will explain, that answer disposes of this appeal and requires us to reverse. We therefore do not reach the Fourth Amendment question.

This is a delinquency proceeding. Youth, age 12, was found to be within the juvenile court's delinquency jurisdiction for acts that if committed by an adult would constitute first-degree sexual abuse, ORS 163.427. That finding was based, in part, on evidence that seminal fluid containing DNA matching youth's was found on underwear belonging to youth's four-year-old stepsister. Officers made the DNA match after obtaining a buccal swab from youth. Youth complied with the buccal swab after the officer described the process to him and his mother told him that it was "okay."

Officers did not obtain a warrant for the buccal swab from youth. Instead, they asked youth's mother and father each to sign written consent forms, which each parent did. Both parents signed forms provided by the Carlton Police Department. Those forms authorized the collection of "biological evidence samples" from youth. The forms required each parent to certify that "I further understand that these samples may be used in a court of law during a criminal procedure/prosecution and may be used as evidence against [youth]."

Because youth and youth's mother were living in Alaska at the time of the swab, the Anchorage Police Department collected the swab on behalf of the Carlton Police Department. The Alaska officers requested that mother also sign the Anchorage Police Department's consent form, and

mother did. On that form—which did not fully track the situation at hand—mother acknowledged that, "having been informed of my Constitutional Rights not to have a search made of my *** person, without a search warrant," she was authorizing police "to conduct a complete search of [youth]." Mother further acknowledged that she was authorizing officers to take "from my *** person any evidence or property needed for the criminal investigation of [unspecified crime] which was reported on 12/22/15."

Before the adjudicatory hearing, youth moved to suppress the DNA evidence obtained through the buccal swab. He argued that the collection of the DNA was both an unconstitutional search and seizure under Article I, section 9, and the Fourth Amendment because officers did not obtain a warrant and, in youth's view, no exception to the warrant requirement applied. In particular, youth contended that he had not himself consented to the search for purposes of the consent exception to the warrant requirement and, further, that the consent of third parties—in this case, his parents—cannot authorize officers to search someone's person in the context of a criminal investigation. The state argued in response that both youth and his parents had validly consented to the search.

The juvenile court denied youth's motion to suppress. Recognizing that the buccal swab was a search of youth, the court concluded that youth validly consented to that search, obviating the need for officers to obtain a warrant. Following the adjudicatory hearing, the court found that youth had committed two acts which, if committed by an adult, would constitute first-degree sexual abuse. In its ruling, the court noted that the evidence connecting youth to the victim's underwear played a pivotal role in its findings. Youth appealed.

On appeal, youth assigns error to the denial of his motion to suppress. He contends that the juvenile court erred in determining that he had voluntarily consented to the buccal swab. He argues further that his parents' consent to the buccal swab, in the absence of his own voluntary consent, did not excuse officers from obtaining the warrant otherwise required by Article I, section 9, and the Fourth

Amendment for the search of his person that occurred when officers swabbed his mouth for DNA. In response, the state, taking a different approach than it did before the juvenile court, does not contend that youth himself voluntarily consented to the buccal swab. The state, instead, contends that youth's mother's consent to the search authorized officers to obtain youth's DNA without a warrant under both Article I, section 9, and the Fourth Amendment.

Following briefing and oral argument, we took this appeal into full court to consider the question presented by the parties' arguments: When a child is a suspect in a criminal investigation, does Article I, section 9, or the Fourth Amendment allow for law enforcement to obtain a DNA sample from the child without first obtaining a warrant or the child's voluntary consent where a parent consents to the taking of the sample? We did so because it is a question of first impression, one that asks us to recognize a new exception to the warrant requirements of Article I, section 9, and the Fourth Amendment, and one for which the answer could have far-reaching consequences for the constitutional rights of Oregon children. For the reasons that follow, we conclude that, for purposes of Article I, section 9, parental consent is not an exception to the warrant requirement that permits law enforcement to search the person of a child suspected of a crime for DNA without obtaining a warrant. The juvenile court therefore erred in concluding that the collection of youth's DNA did not violate his rights under Article I, section 9, and in denying his motion to suppress the DNA evidence from the swab. Accordingly, we reverse and remand.

We review the juvenile court's denial of youth's motion to suppress for legal error. *State v. Bliss*, 363 Or 426, 428, 423 P3d 53 (2018). In so doing, "we are bound by the [juvenile] court's findings of historical facts if there is evidence in the record to support them." *Id*.

Under our well-established "first things first" approach to constitutional claims, *see State v. Babson*, 355 Or 383, 432-33, 326 P3d 559 (2014), we begin with the Article I, section 9, question, starting with a brief refresher on the basics.

Article I, section 9, gives us the right "to be secure in [our] persons, houses, papers, and effects, against unreasonable search, or seizure." It "generally requires law enforcement officers to obtain a warrant before executing a search." *Bliss*, 363 Or at 430. That is, "warrantless searches are *per se* unreasonable unless they fall within one of the few specifically established and limited exceptions to the warrant requirement." *Id*. at 430-31. It is on the state, not a defendant, to demonstrate that a warrantless search is permitted by one of the recognized exceptions to the warrant requirement: "The state has the burden of proving that circumstances existing at the time [of the search] were sufficient to satisfy any exception to the warrant requirement." *State v. Baker*, 350 Or 641, 647, 260 P3d 476 (2011).

When officers take a buccal swab, they conduct a "search" within the meaning of Article I, section 9. *State v. Sanders*, 343 Or 35, 39, 163 P3d 607 (2007). Therefore, because the officers in this case did not obtain a warrant for youth's buccal swab, the swab amounted to a "*per se* unreasonable" search under Article I, section 9, unless the state proved circumstances showing that the swab fell "within one of the few specifically established and limited exceptions to the warrant requirement." *Bliss*, 363 Or at 430-31. Did the state do that here?

In the juvenile court's view, it did. The court thought that the consent exception allowed for the search of youth. That exception, in its most familiar form, allows law enforcement to search a person or the person's property if the person voluntarily consents to the search. *See State v. Blair*, 361 Or 527, 535-36, 396 P3d 908 (2017). The state argued below, and the court agreed, that youth himself had voluntarily consented to the buccal swab. On appeal, however, the state has not renewed that argument, and we agree with the state's tacit concession that the search cannot be justified on the ground that youth voluntarily consented to it. That is because a "defendant's 'mere acquiescence' to police authority does not constitute voluntary consent." *State v. Stanley*, 287 Or App 399, 407, 404 P3d 1100 (2017).

"Acquiescence occurs when an individual is not given a reasonable opportunity to choose to consent or when

he or she is informed that a search will occur regardless of whether consent is given." *Id*. (internal quotation marks and brackets omitted). "In determining whether a particular interaction between police and a defendant amounts to consent, courts pay close attention to the words used by the officer requesting consent." *Id*. "When those words do not provide the listener with a reasonable opportunity to choose to consent, or when those words leave the listener with the impression that a search is inevitable, absent strong countervailing factors, we have consistently found acquiescence rather than consent." *Id*. (internal quotation marks omitted).

Here, youth was not given a reasonable opportunity to choose to consent to the buccal swab. Officer Cameron, who took the swab, introduced himself to youth's mother and told youth:

> "So I am going to have your mom sign some pieces of paper real fast, and then what I'm going to do is, I'm going to use kind [of] a long Q-tip and just kind of swab the inside of your mouth. It doesn't hurt."

Then, immediately before swabbing youth's mouth, Cameron said:

> "All right. So this really is, [b]ud, just basically it's sealed. I'll pull it up, and then, I take out the swabs. And there's my good swabs. So I just basically have you ahh, and then, I just kind of swab the inside of your mouth. Okay? Ready?"

None of those statements communicated to youth that he had any choice but to comply with the swab as directed by the officer. Beyond that, the record contains no other evidence that would support an inference that youth, a 12-year-old boy, was given a reasonable opportunity to choose whether to consent to a test administered by an adult authority figure. The state, therefore, did not demonstrate that youth voluntarily consented to the buccal swab, as distinct from acquiescing to the directives of the officer. The juvenile court erred in concluding otherwise.

The state argues that we can affirm the juvenile court's denial of youth's motion to suppress nevertheless on an alternative basis: that Article I, section 9, and the

Fourth Amendment both permit the warrantless search of the body of a child who is the suspect in a criminal investigation based on parental consent. The state asserts that this rule should follow from the authority and control that parents exercise over the lives of their children. Although the state has not identified a single case adopting the rule that it advocates, it contends that the principle follows from three lines of precedent: cases holding that parents can grant third-party consent to search their children's rooms and property; cases allowing for searches of children's persons pursuant to parental consent where the child is not a suspect in a criminal investigation; and cases holding that parents have a liberty interest in raising their children that is protected by the Fourteenth Amendment to the United States Constitution.

We are not persuaded that the state's proffered rule follows from the authority it cites. Beyond that, the state has not supplied any convincing arguments as to why we should expand the otherwise limited exceptions to the warrant requirement to encompass the state's proposed rule of law.

It is worth repeating that the state has identified no case under either Article I, section 9, or the Fourth Amendment holding that parental consent excuses law enforcement from obtaining a warrant to search the body of a child who is being investigated for a crime when the child himself has not also consented to the search. Although the case law on this particular question is sparse, what little there is under the Fourth Amendment suggests that, to the extent parental consent might properly play a role in assessing the constitutionality of a warrantless search of a child's body, it is something that is necessary *in addition to*, not in lieu of, the child's independent consent. *See People v. K. N.*, 87 NYS3d 862, 870 (NY Crim Ct 2018) (holding that, when juvenile signed consent to a cheek swab for DNA testing "absent parent, legal guardian, guardian ad litem or attorney," the ensuing search was "unlawful as an unreasonable search and seizure in violation of the Fourth Amendment"); *People v. Lehmkuhl*, 117 P3d 98, 101-03 (Colo App 2004) (consent to search of juvenile's blood, saliva, and hair was valid

for constitutional purposes when *both* juvenile and juvenile's parents consented to search). This makes it tough to characterize the parental-consent rule sought by the state as "one of the few specifically established and limited exceptions to the warrant requirement." *Bliss*, 363 Or at 430-31. The Supreme Court recently reiterated that whether an exception to the warrant requirement authorizes a particular warrantless search turns on whether the search was "within the lawful bounds that have been delineated by our earlier decisions as the justification for the exception." *State v. Fulmer*, 366 Or 224, 234, 460 P3d 486 (2020). And the case law simply does not "delineate[]" a parental-consent exception to the warrant requirement that would otherwise apply when the state seeks a buccal swab in the context of a criminal investigation.

In other words, for all practical purposes, the state is asking us to craft a new warrant exception or broaden an existing, more limited, one. Moreover, it is asking us to do so in a way that would mean that children do not receive the full range of procedural protections afforded to adults in the Oregon criminal justice system. In Oregon, children age 12 through 17 can potentially be held criminally responsible for their conduct, ORS 161.290, in just the same way that adults age 18 and above can.[1] Yet the state proposes that children be afforded fewer rights than adults in the criminal investigatory process.

That counsels caution. Recognizing or expanding a warrant exception has significant consequences for the privacy of Oregonians. When undertaking to do so, we should proceed carefully and should entertain the state's request for a new or expanded exception only when the state has made a strong and supported case as to why it is reasonable to recognize a new exception and forgo the protection to our privacy rights afforded by a neutral magistrate's assessment of a proposed warrant. That is especially true where, as here, the state's proposed rule of law (1) would result in children who are subject to criminal prosecution in this state receiving less in the way of criminal procedural protections than

---

[1] *See* ORS 419C.340 to 419C.374 (regarding waiver of juveniles into adult court).

adults and (2) allows for a warrantless search that places children's DNA in the hands of the state—something with consequences that likely go far beyond any that have yet transpired, and any that we have yet imagined.

Here, the state has not made that case. In particular, the state has not shown that obtaining a warrant would be particularly burdensome under circumstances like those in this case or that there are other factors in play that should cause us to conclude that the time is ripe for a new or expanded warrant exception.

The cases on which the state relies—none of which address the circumstances present here—do not point to a different conclusion. Those cases generally fall into three categories: (1) cases addressing warrantless searches of children's rooms and property based on parental consent under the third-party consent doctrine; (2) cases addressing warrantless searches of a child's body under circumstances in which the child herself is not a suspect in a criminal investigation; and (3) cases addressing a parent's right under the Fourteenth Amendment to direct the upbringing of the child. We address those categories in turn.

*Third-party consent doctrine. State v. Carsey*, 295 Or 32, 664 P2d 1085 (1983), is the leading case in the first category. Although technically a Fourth Amendment case, the Supreme Court since has relied on it as authoritative for purposes of Article I, section 9. *See, e.g.*, *State v. Bonilla*, 358 Or 475, 481, 366 P3d 331 (2015) (relying on *Carsey* in explaining the scope of the third-party consent doctrine under Article I, section 9). In *Carsey*, the court considered whether a warrantless search of the 19-year-old defendant's bedroom was valid where the defendant's grandmother, who had legal custody of him, consented to the search.[2] *Carsey*, 295 Or at 35. Rejecting the state's argument "that the parent and child relationship, in and of itself, creates an unconditional right

---

[2] Although the defendant in *Carsey* was over the age of 18, he had been found to be within the delinquency jurisdiction of the juvenile court at an earlier time and was on parole to his grandparents. *Carsey*, 295 Or at 35. For that reason, the Supreme Court analogized the defendant's relationship with his grandparents to a parent-child relationship for purposes of analyzing the grandparent's authority to consent to a search of the defendant's room. *Id*. at 36.

in a custodial parent to consent to the search of the child's room," the court reasoned that the parent-child relationship was one factor to consider when applying the third-party consent doctrine articulated in *United States v. Matlock*, 415 US 164, 94 S Ct 988, 39 L Ed 2d 242 (1974). *Carsey*, 295 Or at 43. That is, under *Carsey*, when law enforcement seeks to search a child's room or property pursuant to parental consent, "[a]lthough the parent-child relationship is an important factor to be considered in determining the validity of the consent in a case in which the consent is obtained from a parent, the validity of consent involves consideration of other factors, an important one being the consenting parent's control over the premises for the search of which consent was given." *Id.*; *see also State v. J. D. H.*, 294 Or App 364, 370-74, 432 P3d 297 (2018) (applying *Carsey* and other cases involving the third-party consent doctrine to determine whether warrantless search of the youth's room, and the containers in it, was justified by the youth's mother's consent to the search).

　　　*Carsey* does not assist the state here, because, as noted, it represents an application of the third-party consent doctrine. For purposes of Article I, section 9, that doctrine, the Supreme Court has explained, allows for warrantless search of *property* based on valid third-party consent. *Bonilla*, 358 Or at 486. "[T]he existence of valid third-party consent depends either on the third party's common authority over the property based on her or his own property interest, *Carsey*, 295 Or at 46, or, alternatively, on the application of agency principles." *Bonilla*, 358 Or at 486. A child is not the property of her or his parents (or anyone else), and we are aware of no cases holding that a parent has a *property* interest in a child. In our view, that makes the third-party consent doctrine, as formulated by the Oregon Supreme Court, inapplicable to searches of persons. This explains, perhaps, why we can find no cases applying the third-party consent doctrine in the context of warrantless searches of a criminal suspect's body, juvenile or otherwise.[3]

---

[3] The dissenting opinion quotes *State v. Banks*, 364 Or 332, 338, 434 P3d 361 (2019), which, in turn, quotes *State v. Weaver*, 319 Or 212, 219, 874 P2d 1322 (1994), for the proposition that the consent exception to the warrant requirement applies when "'someone having the authority to do so voluntarily gave the police

But, even if we are wrong, and even if the agency thread of the third-party consent doctrine could potentially have some applicability to searches of persons in some circumstances, we already have rejected the proposition that a parent, by virtue of the parent-child relationship, has the power to act on a child's behalf to invoke or waive a child's constitutional rights when a child is the suspect in a criminal investigation. As we observed in rejecting a child's argument that his parents had effectively invoked for him his rights against self-incrimination under Article I, section 12, of the Oregon Constitution and the Fifth Amendment to the United States Constitution, notwithstanding his own voluntary waiver of those rights:

> "Child provides no authority, and we are unaware of any, to support the proposition that the personal rights guaranteed by Article I, section 12, of the Oregon Constitution and the Fifth Amendment to the United States Constitution may be effectively invoked (or waived) by anyone other than the individual holding those rights, even if that individual is a juvenile."

*State ex rel Juv. Dept. v. Cook*, 138 Or App 401, 407, 909 P2d 202 (1996), *aff'd on other grounds*, 325 Or 1, 932 P2d 547 (1997). Said another way, under *Cook*, in the context of a criminal investigation, a parent is not a child's agent with the power to waive the child's constitutional rights on the child's behalf simply because the parent is a parent.

*Searches of children who are not suspects in criminal investigations.* The state also points us to several federal cases that suggest that a warrantless search of a child's body is permissible under the Fourth Amendment with parental consent. Those cases are: *Dubbs v. Head Start, Inc.*, 336 F3d 1194 (10th Cir 2003); *Roe v. Texas Dep't of Protective & Regulatory Servs.*, 299 F3d 395 (5th Cir 2002); *Wallis v. Spencer*, 202 F3d 1126 (9th Cir 2000); and *Calabretta v.*

---

consent to search the defendant's person or property,' thereby waiving the right to insist that the government obtain a warrant." 305 Or App at 110 (Tookey, J., dissenting). To the extent that quotation might be read to suggest that those cases extend the third-party consent doctrine to person searches, it is important to note that neither *Weaver* nor *Banks* addressed the third-party consent doctrine. Both were first-party cases. And, in any event, as the dissenting opinion recognizes, whether a third-party can consent to the warrantless buccal swab of another person is an issue of first impression in this state.

*Floyd*, 189 F3d 808 (9th Cir 1999). But none of those cases involved the searches of children who were themselves the targets of criminal investigations. *Dubbs* involved intrusive medical examinations of children enrolled in a public education program. 336 F3d at 1197. *Roe* involved the inspection of the body of a six-year-old girl who was a suspected victim of child abuse. 299 F3d at 398. *Wallis* and *Calabretta* likewise involved the inspection of the bodies of children suspected to be victims of abuse. *Wallis*, 202 F3d at 1130-31; *Calabretta*, 189 F3d at 810.

In those contexts, we allow that it may be consistent with Article I, section 9's reasonableness requirement to allow for the warrantless search of a child's body based on parental consent even in the absence of the child's consent. We are not called upon to answer that question today. We simply note that the question we are called upon to answer—whether law enforcement can search the body of a child who is a suspect in a criminal investigation based on parental consent alone, without the consent of the child—is not one that is answered or addressed by cases allowing for the warrantless searches of children who are not themselves the subjects of criminal investigations. To the extent that such an exception exists or should be recognized, it would be animated by, and circumscribed by, entirely different justifications. *See Fulmer*, 366 Or at 233-34 ("[T]he contours and scope of the particular exception are circumscribed by the justification for that exception.").

*Parents' Fourteenth Amendment rights.* The remaining line of authority that the state invokes—and that which principally informs the dissenting opinion—is the authority holding that parents have a fundamental liberty interest in parenting their children, specifically, *Troxel v. Granville*, 530 US 57, 120 S Ct 2054, 147 L Ed 2d 49 (2000), and *Wisconsin v. Yoder*, 406 US 205, 92 S Ct 1526, 32 L Ed 2d 15 (1972). The state contends that the Fourteenth Amendment right recognized in those cases requires us to recognize—at least in some circumstances—a parental-consent exception to Article I, section 9's warrant requirement that would otherwise apply to the state's request for a buccal swab from a suspect in a criminal investigation. We reject that approach for three reasons.

First, we question the state's standing to assert the Fourteenth Amendment rights of parents, at least where, as here, the state is acting in a prosecutorial capacity with respect to a child, rather than its protective capacity. It is important to recognize that the state is not pressing this argument to vindicate anyone's parental rights. The state is doing so to defend a search that is presumptively unconstitutional because the state did not obtain a warrant and the state has been unable to show that it obtained youth's consent. It is also important to recognize that we have no *parents* before us as parties to this case arguing that affording minors the same minimum constitutional criminal procedural protections afforded adults interferes meaningfully with their parent-child relationships, or their ability to direct their children's upbringing. These are reasons for reservations.

Second, the state's argument misapprehends the nature of the right recognized in *Troxel* and other cases. The right is a *limitation* on the state (and other governments). It restricts the state's power to *interfere* with the private, discretionary choices a parent might make in bringing up a child. *Troxel*, 530 US at 65 (explaining that the "substantive component" of the Due Process Clause of the Fourteenth Amendment affords protection against governmental interference with particular liberty interests, including the liberty interest in parenting); *Pierce v. Society of Sisters*, 268 US 510, 534-35, 45 S Ct 571, 69 L Ed 1070 (1925) (holding that Oregon's compulsory education act violated the Due Process Clause because the act "unreasonably *interferes* with the liberty of parents and guardians to direct the upbringing and education of children under their control" (emphasis added)). That is why, for example, some courts have held that, absent emergency circumstances or a court order, the Fourteenth Amendment protects a parent's right to require the government to obtain parental consent before conducting a physical examination of a child for the purposes of a criminal investigation. *See Wallis*, 202 F3d at 1141-42. (And that is why, absent a warrant or emergency circumstances, the Fourteenth Amendment may have required the state to obtain parental consent to conduct the buccal swab here—in addition to youth's consent.)

Requiring the government to comply also with the *additional* limitations on searches imposed by Article I, section 9 (or the Fourth Amendment itself, for that matter), is consistent with the limitation on governmental interference with parenting decisions imposed by the Fourteenth Amendment. That is because it imposes additional barriers to state interference in a family, further restricting the state's ability to intervene. But, a constitutional right to *exclude* the state from the parent-child relationship is fundamentally different from a positive right to *engage* the state in that relationship, something the state's arguments contemplate but the Supreme Court has rejected. *See DeShaney v. Winnebago County Dept. of Social Servs.*, 489 US 189, 196, 109 S Ct 998, 103 L Ed 2d 249 (1989) ("[O]ur cases have recognized that the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual.").

To conclude that the Fourteenth Amendment gives parents a constitutionally protected interest in unilaterally waiving their children's constitutional rights would alter the scope of the right recognized in *Troxel* and other cases. It would transform the right from a limitation on governmental interference in the parent-child relationship to a grant of power to parents—the power to determine unilaterally whether their children should receive the same constitutional criminal procedural protections that adults do, and the power to bring the state into the family relationship. That approach is difficult to square with the Supreme Court's expressed view of parental power over their children's constitutional rights, and difficult to square with the notion of the Fourteenth Amendment as a limitation on government. *See Planned Parenthood of Central Mo. v. Danforth*, 428 US 52, 74-75, 96 S Ct 2831, 49 L Ed 2d 788 (1976), *overruled on other grounds in part by Planned Parenthood of Southeastern Pa. v. Casey*, 505 US 833, 112 S Ct 2791, 120 L Ed 2d 674 (1992) (rejecting contention that state could give a parent "veto power" over minor child's exercise of constitutional right to abortion where child had capacity to consent to the termination of her pregnancy); *see also*

*DeShaney*, 489 US at 197-203 (explaining that, as a general matter, "the Due Process Clause does not require the State to provide its citizens with particular protective services").

Third, affording a child the same constitutional right to be free from an unconsented-to warrantless search afforded to adults under Article I, section 9, as a practical matter, does not mean that parents will be unable to obtain the assistance of the criminal justice system. It means that a child suspected of a crime and facing a potential criminal prosecution—along with a lifetime of potential attendant consequences[4]—is entitled to receive the same protection that Article I, section 9, indisputably provides adults. Parents can report a child's conduct to law enforcement and cooperate with any ensuing investigation. If that information and investigation give law enforcement probable cause to conduct a buccal swab of a child, and law enforcement obtains a warrant or acts within a recognized exception to the warrant requirement, then law enforcement will be able to conduct a buccal swab.

For the above reasons, we conclude that the warrantless buccal swab of youth violated his rights under Article I, section 9. Youth did not voluntarily consent to that search, and the state has not persuaded us that we should expand the existing, limited exceptions to the warrant requirement so as to permit the warrantless buccal swab of a child who is a suspect in a criminal investigation based on parental

---

[4] In support of its conclusion that parents should be able to consent to a buccal swab of a child when the child has not, the dissenting opinion notes that juvenile delinquency proceedings are not criminal prosecutions and that youth ultimately was not charged with a crime that could subject him to prosecution as an adult, and suggests that parents could have an interest in submitting their children to the rehabilitative process afforded by the juvenile justice system. 305 Or App at 113-14 (Tookey, J., dissenting). But at the time law enforcement conducted the buccal swab here, it was not a foregone conclusion that youth's case would be handled within the juvenile justice system. In fact, as noted above, both consent forms signed by mother made clear that the purpose of the swab was to obtain evidence as part of a *criminal* investigation. So the question before us is *not* whether a warrantless search of a child's person pursuant to parental consent is authorized by Article I, section 9, if the state has committed to redress any conduct through the juvenile justice system and not through a criminal prosecution. Because the state made it express that it was seeking evidence that could be used in a criminal prosecution, the question is whether Article I, section 9, authorizes a warrantless search of a child's body pursuant to parental consent for the purposes of a criminal investigation.

consent. The juvenile court erred in concluding otherwise and should have granted youth's motion to suppress. The error was not harmless, because the record indicates that the DNA evidence obtained through the swab affected the juvenile court's finding that youth was in the court's delinquency jurisdiction for acts that if committed by an adult would constitute first-degree sexual abuse.

Reversed and remanded.

**TOOKEY, J.,** concurring in part, dissenting in part.

This juvenile delinquency case requires that we contemplate the nature of the historic parent-child relationship within the context of a mother's consent to a search of her child's mouth to collect DNA evidence. In particular, it requires us to consider the disparate interests and voices reflected in the life and structure of parent-child relationships.

In doing so, we must be cognizant that parents hold "perhaps the oldest of the fundamental liberty interests recognized by [the] Court"—the "care, custody, and control of their children." *Troxel v. Granville*, 530 US 57, 65, 120 S Ct 2054, 147 L Ed 2d 49 (2000); *see also Wisconsin v. Yoder*, 406 US 205, 232, 92 S Ct 1526, 32 L Ed 2d 15 (1972) ("The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition."). It is the policy of the State of Oregon "to guard the liberty interest of parents protected by the Fourteenth Amendment to the United States Constitution." ORS 419B.090(4). Parents have a "right[]" to "direct the upbringing of their children." *Id*.

Thus, as the Oregon Supreme Court has recognized, parents of minor children, "by reason of the parent-child relationship, have a measure of control over all aspects of their childrens' lives, activities, effects, and living quarters." *State v. Carsey*, 295 Or 32, 42, 664 P2d 1085 (1983). But there is a necessary corollary to that control:

> "Traditionally at common law, and still today, uneman-
> cipated minors lack some of the most fundamental rights of
> self-determination—including even the right of liberty in
> its narrow sense, *i.e.*, the right to come and go at will. They
> are subject, even as to their physical freedom, to the control
> of their parents or guardians."

*Vernonia School Dist. 47J v. Acton*, 515 US 646, 654, 115 S Ct
2386, 132 L Ed 2d 564 (1995).

The control that parents have over their children is,
at least in part, a product of the many duties that parents
have toward their children. *Carsey*, 295 Or at 42 ("A par-
ent has manifold duties toward his or her minor children,
duties which give rise to correlative rights of control over the
child."). In Oregon, those duties include, but are not limited
to, providing their children with "[p]ermanency with a safe
family," "[f]reedom from physical, sexual or emotional abuse
or exploitation," and "[f]reedom from substantial neglect of
basic needs," ORS 419B.090(2); providing needed medical
care, *State v. Beagley*, 257 Or App 220, 224, 305 P3d 147
(2013) (recognizing that parents have "an absolute duty to
provide needed medical care to a child, subject only to leg-
islatively established exceptions" (internal quotation marks
omitted)); and preventing a child under the age of 15 from
committing an act that would bring the child within the
jurisdiction of the juvenile court, ORS 163.577(1).

The duties parents have toward their children give
rise to correlative rights of control because the "law's con-
cept of the family rests on a presumption that parents pos-
sess what a child lacks in maturity, experience, and capacity
for judgment required for making life's difficult decisions."
*Parham v. J. R.*, 442 US 584, 602, 99 S Ct 2493, 61 L Ed 2d
101 (1979). "Most children, even in adolescence, simply are
not able to make sound judgments concerning many deci-
sions ***. Parents can and must make those judgments."
*Id.* at 603.

But, in addressing the legal question presented by
this case, we also must be mindful that the rights of par-
ents *vis-à-vis* their children are not unlimited. That is, chil-
dren have rights of their own. *See, e.g., Carey v. Population
Services, International*, 431 US 678, 694, 97 S Ct 2010, 52

L Ed 2d 675 (1977) (recognizing that the "State may not impose *** a blanket requirement of parental consent[] on the choice of a minor to terminate her pregnancy"); *Parham*, 442 US at 604 (recognizing constitutional constraints on involuntary commitment of juveniles by parents, but noting that parents "retain a substantial, if not the dominant, role in the decision, absent a finding of neglect or abuse, and that the traditional presumption that the parents act in the best interests of their child should apply"); ORS 419B.090(2)(a) ("It is the policy of the State of Oregon to recognize that children are individuals who have legal rights."). One such right is the right to be free from unreasonable searches and seizures. *Carsey*, 295 Or at 42-43 ("Although the constitutional rights of the child must be considered in light of the historic parent-child relationship, a child's constitutional right to be free from unreasonable searches is not a right that comes into being only when the child attains majority.").

It is against the backdrop of those rights and those duties that we must decide whether a child's Article I, section 9, rights are violated when a law enforcement officer, with parental consent, takes a warrantless DNA swab of the child and the child is the subject of a criminal investigation. I dissent because I disagree with the majority's conclusion that, when a child is the subject of a criminal investigation, the child's rights under Article I, section 9, are violated if, with parental consent, a law enforcement officer conducts a warrantless search of the child for DNA evidence, and the child does not refuse to allow the search to happen, but, instead, acquiesces to it.[1] 305 Or App at 90.

Cognizant of the fundamental liberty interest that parents have in the upbringing of their children, and the responsibilities that they have toward their children—including, as I view it, a responsibility to protect a child from the child's own criminal conduct or the criminal conduct of a sibling—I would conclude that there are some circumstances under which a child's right to privacy is not violated when a parent consents to a warrantless buccal swab of their child

---

[1] I agree with the majority's conclusion that the state did not demonstrate that youth voluntarily consented to the buccal swab, as distinct from acquiescing to the directives of the officer, and that the juvenile court erred in concluding otherwise. 305 Or App at 92.

by a law enforcement officer. I would also conclude that, similar to the analysis that we undertake in cases applying the "common authority" rule to searches of minor children's bedrooms and effects, the analysis that we undertake in assessing whether a parent has authority to consent to a search of their minor child for DNA evidence should focus on the nature of the particular relationship between the parent and the child, including whether (and to what extent) the parent exercised control over the child. Finally, turning to the facts of this case, I would conclude that reversal and remand is appropriate for the juvenile court to determine, in the first instance, whether youth's mother had authority to consent to a search of youth's mouth, including making the necessary factual findings related to that issue.

Consequently, I would reverse and remand for further proceedings consistent with this opinion.

## HISTORICAL AND PROCEDURAL FACTS

"[W]e state the facts and all reasonable inferences that the record supports in the light most favorable to the juvenile court's denial of the motion to suppress." *State v. A. S.*, 296 Or App 722, 724, 443 P3d 618, *rev den*, 365 Or 502 (2019). "[W]e presume that the trial court implicitly resolved any * * * disputed factual matters 'consistently with its ultimate conclusion' to the extent that resolving those factual disputes was necessary to the court's conclusion and to the extent that the record supports the implicit findings." *State v. Decker*, 290 Or App 321, 323, 417 P3d 449 (2018) (quoting *Pereida-Alba v. Coursey*, 356 Or 654, 671, 342 P3d 70 (2015)). "If an implicit factual finding is not necessary to a trial court's ultimate conclusion or is not supported by the record, then the presumption does not apply." *Pereida-Alba*, 356 Or at 671.

Officer Blair, of the Carlton Police Department in Oregon, was investigating alleged instances of sexual abuse committed by youth, a 12-year-old boy, against his four-year-old stepsister, that occurred while youth was living with his father in Oregon. In connection with the investigation, in August 2015, Blair interviewed youth, with youth's father present.

In October 2015, youth relocated to Anchorage, Alaska, to live with his mother. Subsequently, Blair contacted youth's mother and youth's father in an effort to obtain a DNA sample from youth in connection with the investigation. Youth's father signed a form consenting to the collection of youth's DNA.

After learning that youth was residing in Anchorage, Blair arranged for the Anchorage Police Department to assist the Carlton Police Department in obtaining a DNA sample from youth.

The Anchorage Police Department assigned the task of collecting the DNA sample from youth to Detective Cameron. In December 2015, Cameron went to youth's mother's house to obtain the DNA sample. Cameron did not have a warrant. Cameron made an audio recording of his interaction with youth and youth's mother. The audio recording was played into the record in the juvenile court during the hearing on youth's motion to suppress. The transcript of that hearing reflects that, after introducing himself to youth's mother, Cameron had the following exchange with youth and youth's mother:

"DETECTIVE CAMERON:　How are you doing. Are you [youth]?

"[YOUTH]:　Yes.

"DETECTIVE CAMERON:　Hey, [youth]. You can call me Will, or Detective Cameron. How are you doing, sir?

"So I am going to have your mom sign some pieces of paper real fast, and then what I'm going to do is, I'm going to use kind [of] a long Q-tip and just kind of swab the inside of your mouth. It doesn't hurt. Remember, that's soft cotton on—

"[YOUTH'S MOTHER]:　They've been practicing it in science, I guess.

"DETECTIVE CAMERON:　Oh.

"[YOUTH'S MOTHER]:　So he's—

"DETECTIVE CAMERON:　Oh, great. Right.

"It's just like that, man. So how old are you?

"[YOUTH]:    I'm 12, almost 13."

Cameron then requested that youth's mother sign "consent waiver" forms from both the Carlton and Anchorage police departments. Cameron and youth's mother had the following exchange while Cameron reviewed the consent waiver forms with youth's mother:

"DETECTIVE CAMERON:   I'm going to have you sign our consent waiver as well, and I will read through it fast, but it's just going to say, I, [youth's mother], have been informed of my constitutional rights not to have a search made with my (indiscernible) your son's mouth—

"[YOUTH'S MOTHER]:   Yeah.

"DETECTIVE CAMERON:   —without a search warrant, of my right to refuse a consent to search do hereby authorize law enforcement to conduct a complete search of, and we'll put in *** [youth's] mouth, located at your residence here. The authorization is given voluntarily. There were no threats or promises given. Having the right to do so authorizes the officer to take from my person any evidence, property, with a criminal investigation."

While Cameron reviewed the consent waiver forms with youth's mother, youth received a phone call, which led to the following exchange:

"[YOUTH'S MOTHER]:   No. You just stay here. You can't leave. You can wait a minute. Tell her you will call her back if you want to.

"[YOUTH]:    I've got to call you back in a little bit. Bye."

Youth was present when Cameron reviewed the consent waiver forms with youth's mother, but youth was not asked to sign a consent waiver form or provided information regarding his constitutional rights at that time. After youth's mother signed the consent waiver forms provided by Cameron, Cameron had the following exchange with youth and obtained the buccal swab:

"DETECTIVE CAMERON:   ***

"All right. So this really is, Bud, just basically it's sealed. I'll pull it up, and then, I take out the swabs. And there's

my good swabs. So I just basically have you ahh, and then, I just kind of swab the inside of your mouth. Okay? Ready?

"[YOUTH'S MOTHER]:   It's okay, Bum.

"DETECTIVE CAMERON:   It doesn't hurt at all.

"* * * * *

"DETECTIVE CAMERON:   * * *

"There you go. Just like that. Then, I kind of let this dry for just a second before I put it back in there, and then— and then go, and we're done. And I'll give you a copy of it when we're done."

Subsequently, youth was charged with committing acts that, if committed by an adult, would constitute two counts of sexual abuse in the first degree, ORS 163.427. Prior to trial, relying on both state and federal constitutional grounds, youth moved to suppress "the DNA evidence * * * due to illegal search and seizure [and] lack of consent."

During the hearing on youth's motion to suppress, youth's mother provided testimony regarding youth. She explained that youth is "compliant," does what she "tell[s] him to do," and does not "argue with [her] if [she] tell[s] him to do something." With respect to youth's body, she testified that youth "has control over his body," that she had "given him an expectation that his body is his," that she had not "given him an expectation that [she] can control [his] body in any way," and that she had conversations with youth "about his body being private." Youth's mother also testified that she told youth, prior to Cameron arriving, that an officer was coming to youth's house and that "he was going to do a swab in [youth's] mouth." She further testified that when "Cameron asked [youth] to open his mouth and give the sample," she told youth "that it was okay and that [youth] should do it," but that she did not specifically "tell [youth] that he had to do the buccal swab."

Additionally, during the hearing on his motion to suppress, youth argued, among other points, that (1) he did not voluntarily consent to the search of his mouth, but "just acquiesced" and (2) his parents did not have actual authority to consent to the search of his mouth. The state, for its

part, argued that (1) youth consented to the search or, alternatively, (2) youth did not need to consent because youth's parents consented.

The juvenile court determined that youth consented to the search "upon advice of his mom" and that that consent was voluntary. Accordingly, it denied youth's motion to suppress the DNA evidence.

After a trial, the juvenile court found youth within the jurisdiction of the juvenile court for acts that, if committed by an adult, would constitute two counts of first-degree sexual abuse, ORS 163.427, noting that the DNA evidence that had been collected from youth via the warrantless buccal swab was critical to its determination that youth committed the conduct for which he was charged beyond a reasonable doubt.

## ANALYSIS

"Article I, section 9, of the Oregon Constitution prohibits unreasonable searches and seizures of 'persons' and their 'houses, papers, and effects.'" *State v. Banks*, 364 Or 332, 337, 434 P3d 361 (2019). "As a general matter, juveniles are entitled to the protections guaranteed by Article I, section 9, including its protection against unreasonable search," *State v. J. D. H.*, 294 Or App 364, 369, 432 P3d 297 (2018), *rev den*, 364 Or 409 (2019) (internal quotation marks and brackets omitted), although "[p]arents may have rights and duties concerning a minor child that affect the child's exercise of his or her rights under that constitutional guarantee," *State ex rel Juv. Dept. v. S. L. M.*, 227 Or App 408, 411, 206 P3d 283 (2009). "A defendant has 'a constitutional right to exclude evidence obtained in violation of Article I, section 9' from a criminal prosecution." *State v. Sines*, 287 Or App 850, 862, 404 P3d 1060 (2017), *rev den*, 362 Or 545 (2018) (quoting *State v. Tanner*, 304 Or 312, 315 n 2, 745 P2d 757 (1987)).

We have concluded that "obtaining genetic material by swabbing the inside of an individual's cheek" is "a search within the meaning of Article I, section 9," and have observed that, although "obtaining genetic material by swabbing the inside of an individual's cheek—certainly is

less invasive than, say, piercing the skin with a syringe"—it is "materially indistinguishable from blood draws or urine samples by which the state obtains bodily fluids that are not ordinarily available for public inspection." *Department of Justice v. Spring*, 201 Or App 367, 372, 120 P3d 1 (2005), *rev den*, 340 Or 483 (2006); *see also State v. Sanders*, 343 Or 35, 39, 163 P3d 607 (2007) ("One ordinarily also has a right to privacy that protects against having a government agent swab the inside of one's cheek and then testing the swab to reveal physiological data."). Like blood draws, bodily fluids obtained via a cheek swab are an "intrusion by a governmental agent into the protected privacy interest of the individual, in that they permit[] the state to learn about the most personal of medical details about an individual's private life that would not be known to the public in general." *Spring*, 201 Or App at 372 (so noting with respect to blood draws and urinalysis). The Oregon Supreme Court "has adopted a categorical view under Article I, section 9, that, subject to certain specifically established and limited exceptions, deems warrantless searches to be *per se* unreasonable." *State v. Bonilla*, 358 Or 475, 480, 366 P3d 331 (2015) (*Bonilla II*).

One such exception to the warrant requirement "is voluntary consent to search." *Banks*, 364 Or at 337. "That exception is established when the state proves that 'someone having the authority to do so voluntarily gave the police consent to search the defendant's person or property,' thereby waiving the right to insist that the government obtain a warrant." *Id.* at 337-38 (quoting *State v. Weaver*, 319 Or 212, 219, 874 P2d 1322 (1994)). Under Article I, section 9, at least where consent is given by a person other than the defendant, the consenting person must have "actual authority" to consent to the search.[2] *A. S.*, 296 Or App at 727.

"Where, as in this case, the police rely on consent from someone other than the defendant, it is necessary to establish the basis of the third party's authority. As an example of valid authority, a co-inhabitant with common authority over property, based on joint access or control,

---

[2] In contrast, "[u]nder the Fourth Amendment, the requisite authority can be actual or apparent." *A. S.*, 296 Or App at 727.

generally has authority to give consent to search the property." *Bonilla II*, 358 Or at 481 (citing *Carsey*, 295 Or at 41).[3]

"'Whether [a] third party had actual authority [to consent to a search] involves a resolution of factual issues, but the question of whether a person ha[d] actual authority at the time consent is given is ultimately a question of law.'" *State v. Bonilla*, 267 Or App 337, 341, 341 P3d 751 (2014), *aff'd*, 358 Or 475, 366 P3d 331 (2015) (*Bonilla I*) (quoting *State v. Surface/Hurley*, 183 Or App 368, 372-73, 51 P3d 713 (2002) (third brackets in *Bonilla I*)).

As explained further below, the "common authority" rule has been applied by Oregon appellate courts in the context of parent-minor-child relationships to uphold warrantless searches of minor children's bedrooms and effects when such searches were consented to by the minor children's parents. *See, e.g.*, *J. D. H.*, 294 Or App at 376.

In *Carsey*, the Supreme Court explained that, under the common-authority rule, "the parent-child relationship is an important factor to be considered in determining the validity of the consent," but other factors too must be considered, "an important one being the consenting parent's control over the premises for the search of which consent was given." 295 Or at 43.

Prior to this case, Oregon appellate courts have not considered whether, and under what circumstances, parents have actual authority to consent to governmental searches of their minor children's bodies.

On appeal, the state argues that we should apply a similar rule to the "common authority" rule to allow parents, in certain circumstances, to consent to searches of the inside of their minor children's bodies. The state contends

---

[3] In *Bonilla II*, the Supreme Court explained,

"'[c]ommon authority rests on mutual use of property by persons generally having joint access or control for most purposes so that it is reasonable to recognize that any of the co-inhabitants has the right to permit inspection in his own right, and that the others have assumed the risk that one of their number might permit the common area to be searched.'"

358 Or at 481 n 3 (quoting *Carsey*, 295 Or at 41).

that "the same circumstance-specific inquiry that governs searches of a child's property governs where, as here, a parent consents to a search involving the child's body." In the state's view, we should "conclude, \* \* \* that parents have the authority to consent to searches involving their children's bodies, at least in some circumstances, just as they have authority to consent to searches involving their children's living space and effects" because "'parents, by reason of the parent-child relationship, have a measure of control over all aspects of their children's lives, activities, effects, and living quarters.'" (Quoting *Carsey*, 295 Or at 42.)

Youth, for his part, argues that "[c]onsent for the search of a person's mouth, and resulting seizure of his DNA, must be given by the person himself, not a third party." Youth contends that when a "search is conducted under the state's police power, rather than its *parens patriae* power, the youth's privacy rights in the youth's own body may not be waived by a parent." In youth's view, the search in this case "fell squarely into the state's exercise of its police power because it was conducted during a criminal investigation of youth."

Cognizant of the "fundamental liberty interests" of parents over the "care, custody, and control of their children," *Troxel*, 530 US at 65, and the "primary role of the parents in the upbringing of their children," *Yoder*, 406 US at 232, I would reject youth's proposed categorical rule—the rule adopted by the majority—that, under Article I, section 9, a parent can never consent to law enforcement searching a child's mouth for DNA evidence when the search is conducted in the course of a criminal investigation of the child, even where the child does not object to the search. Instead, in part guided by *Carsey*, and other cases where Oregon appellate courts have considered whether parents had actual authority to consent to warrantless searches of their minor children's bedrooms and effects, I would conclude that there are some circumstances under which a child's right to privacy under Article I, section 9, is not violated when a law enforcement officer conducts a warrantless search of the child for DNA evidence during a criminal investigation after obtaining consent for the search from the child's parent.

That is, there are some circumstances where parents have actual authority to consent to such a search.

That conclusion reflects that case law regarding parental consent to search a child's bedroom and effects "reflects not just property law concepts, but social mores as well." *A. S.*, 296 Or App at 734; *see also State v. Newcomb*, 359 Or 756, 764, 375 P3d 434 (2016) ("[T]he right to privacy that Article I, section 9, protects is the freedom from scrutiny as determined by social and legal norms of behavior * * *." (Internal quotation marks omitted.)). And that, as between parents and children, "there is a societal understanding of superior and inferior authority between the two." *A. S.*, 296 Or App at 734-35.

Further, the conclusion that, at least in some circumstances, parents have actual authority to consent to warrantless searches of their minor children for DNA evidence, even when a minor child is the subject of a criminal investigation, recognizes that, as explained above, the "law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions." *Parham*, 442 US at 602. A parent in youth's mother's situation could conclude that, given youth's alleged conduct, early interaction with the juvenile justice system might be beneficial, not harmful, to youth. *See, e.g.*, Robert Prisco, *Parental Involvement in Juvenile Sex Offender Treatment: Requiring A Role As Informed Supervisor*, 53 Fam Ct Rev 487, 487, 490 (2015) (noting that juvenile sex offenders "that participate in treatment have shown lower recidivism rates than adult offenders or untreated juvenile sex offenders," that juvenile sex offenders are "more receptive to treatment than adults," and observing that "[r]ealistically, * * * only court-mandated and supervised treatment has a chance of being successful and effective"); Mary Ann Farkas & Gale Miller, *Sex Offender Treatment: Reconciling Criminal Justice Priorities & Therapeutic Goals*, 21 Fed Sent'g Rep 78, 78-79 (2008) ("A belief among many clinicians is that sex offenders must acknowledge their responsibility for the offense and their problem sexual behavior before they can fully participate in treatment and work toward change."); *see also Parham*, 442

US at 602-03 ("That some parents may at times be acting against the interests of their children * * * creates a basis for caution, but is hardly a reason to discard wholesale those pages of human experience that teach that parents generally do act in the child's best interests." (Internal quotation marks omitted.)). As we have observed, "juvenile delinquency proceedings are not criminal proceedings but are, instead, something quite different—proceedings to rehabilitate children." *State v. S.-Q. K.*, 292 Or App 836, 846, 426 P3d 659, *adh'd to as modified on recons*, 294 Or App 184, 426 P3d 258, *rev den*, 364 Or 209 (2018).[4]

As presented by the facts of this case involving siblings, a parent could conclude that a youth's involvement with the juvenile justice system could be necessary to fulfill the parent's duty to protect the parent's other children from further sexual abuse, thereby affording the parent's other children with the right to which the children are entitled under Oregon law. *See* ORS 419B.090(2) (children have the right to freedom "from physical, sexual or emotional abuse or exploitation," and parents have a duty to afford their children that right).

In my view, a categorical rule that prohibits all parents, in all circumstances, from making the difficult decision to subject their child to a warrantless search for DNA evidence in the course of a criminal investigation, even when the child does not object, and without considering the nature of the particular parent-child relationship, fails to give "perhaps the oldest of the fundamental liberty interests recognized by [the] Court," *viz.*, "the interest of parents in the care, custody, and control of their children," *Troxel*, 530 US at 65, its due, and fails to recognize that the many

---

[4] The majority asserts that "it was not a foregone conclusion that youth's case would be handled within the juvenile justice system." 305 Or App at 101 n 4. We note that youth was 12 years old when he committed the conduct with which he was charged and was not charged with a crime that could subject him to prosecution as an adult. *See* ORS 419C.352 (the juvenile court "may waive a youth under 15 years of age at the time the act was committed to a circuit court for prosecution as an adult" only if the youth is alleged to have committed "murder or any aggravated form thereof," or if the youth is alleged to have committed first-degree rape, sodomy, or unlawful sexual penetration by forcible compulsion). The law recognizes the immaturity of children of that age and their concomitant capacity for reformation by not allowing children charged with the crime that youth was charged with committing to be prosecuted as an adult.

duties parents have toward their children require that parents must make important and difficult decisions on their children's behalf.

Instead, in part guided by the court's analysis in *Carsey*, I would conclude that whether a parent has actual authority to consent to a warrantless search of their child's body for DNA evidence is governed by a circumstance-specific inquiry focused on the nature of the relationship between the parent and the child, including whether (and to what extent) the parent exercised control over the child.[5] That inquiry may consider facts, including, but not limited to, the minor's age, the nature of the search, the level of privacy enjoyed by the minor *vis-à-vis* the consenting parent, and whether the minor and parent had any particular agreement regarding the minor's body.

I next turn to what I believe the disposition in this case should be. To frame that analysis, I first discuss three cases in which Oregon appellate courts have applied the "common authority" rule in the context of parent-minor child relationships, beginning with the Oregon Supreme Court's seminal opinion in *Carsey*.[6] In that case, in the trial

---

[5] For clarity, I note that I agree with the majority that "the Fourteenth Amendment does not give parents a constitutionally protected interest in unilaterally waiving their children's constitutional rights." 305 Or App at 100. Fourteenth Amendment jurisprudence, however, serves to highlight what our society has long recognized: Parents have a right, and an affirmative duty, to make many difficult choices on their children's behalf.

As noted above, it is the parent's duties to his or her child that "give rise to correlative rights of control over the child." *Carsey*, 295 Or at 42. And, although a parent's rights *vis-à-vis* his or her child are certainly not unlimited, I believe we must recognize the extent of parental rights and duties, as well as the myriad family situations (and maturity levels of juveniles) that exist, when answering the legal question presented in this case. Doing so is consistent with our prior recognition that "[p]arents may have rights and duties concerning a minor child that affect the child's exercise of his or her rights under" Article I, section 9. *S. L. M.*, 227 Or App at 411 (citing *Carsey*, 295 Or at 42-43); *see also State v. Fulmer*, 366 Or 224, 233-34, 460 P3d 486 (2020) ("[T]he exceptions to the warrant requirement *** must be applied consistently with the purposes animating the exception.").

[6] *Carsey* was decided under the Fourth Amendment to the United States Constitution; however, both we and the Supreme Court have subsequently applied its reasoning when analyzing motions to suppress predicated on Article I, section 9. *Bonilla II*, 358 Or at 481; *Bonilla I*, 267 Or App at 342 n 5 ("Although *Carsey* addressed a Fourth Amendment-based challenge, we have subsequently applied its reasoning with respect to motions predicated on Article I, section 9.").

court, the defendant moved to suppress evidence that was discovered in the defendant's bedroom at his grandparents' house during a warrantless search. 295 Or at 34. The warrantless search had been consented to by the defendant's grandmother. *Id.*

The trial court described the living arrangement between the defendant and his grandparents as follows:

> "The Defendant occupied a bedroom in his grandparents' home for which he paid $60 per month as rent. He did his own cleaning and washing. His grandfather never went into his room. His grandmother never went into his room except to stick her head in and tell him that a meal was ready. She characterized the arrangement as an unspoken agreement that his room was under his exclusive control."

*Id.* at 36. The trial court ultimately "found that the defendant had exclusive control over his room" and held that the "grandmother's consent was unauthorized." *Id.* at 34 (internal quotation marks omitted). Even so, the trial court denied the defendant's motion to suppress because, in its view, "the police had a good faith objective and reasonable belief that the grandmother had authority to consent." *Id.* (internal quotation marks omitted). We reversed the trial court's order denying suppression and the state appealed.

On appeal to the Supreme Court, the court initially noted that, although the defendant was 19 years old, it assumed, for the purposes of its opinion, that the grandmother "had legal custody of the defendant and had the same relationship to the defendant as a parent to a minor child living at home."[7] *Id.* at 35-36. In analyzing whether the defendant's grandmother had actual authority to consent to a search of the defendant's room, the court first recognized that

> "[c]ases involving consent obtained from parents or other relatives pose unique problems stemming from the fact that families ordinarily have common use of many household areas; that it is normal for the owner of a home to

_____

[7] The court in *Carsey* so assumed because the defendant was living with his grandparents while he was on parole under a release agreement for conduct in which he had engaged as a juvenile. 295 Or at 35-36.

> exercise control over all areas of the home, or if control is not actually exercised or is seldom exercised, that the right to exercise control over all areas exists; and that parents, by reason of the parent-child relationship, have a measure of control over all aspects of their childrens' lives, activities, effects, and living quarters."

*Id.* at 42. The court then explained that it was "not prepared to hold * * * that the relation of parent and child, as a matter of law, in and of itself and in every case, necessarily creates the foundation for a valid consent search," but that in "many, perhaps most[ ] cases[,] the facts would support such a finding." *Id.* It went on to state, as noted above, that "the parent-child relationship is an important factor to be considered in determining the validity of the consent in a case in which the consent is obtained from a parent," but other factors too must be considered, "an important one being the consenting parent's control over the premises for the search of which consent was given." *Id.* at 43.

Ultimately, in *Carsey*, the court concluded that the trial court did not err in determining that the grandmother lacked actual authority to consent to the search because there were facts in the record that "support[ed] the trial court's finding that the defendant 'had exclusive control over his room'" and it was "bound by those factual determinations." *Id.* at 43, 46.

Subsequently, in *S. L. M.*, we considered whether the trial court had erred by failing to suppress evidence that was discovered when the defendant's mother searched the defendant's purse at the suggestion of a police officer. 227 Or App at 410. The defendant in *S. L. M.* was 16 years old at the time of the search. *Id.* In analyzing the motion to suppress, we recognized that, under *Carsey*, "[t]he extent of a parent's authority [to authorize a search of their child's property] depend[s] on the facts of each case—for example, the nature of the relationship between the parent and the child and, in particular, the record of the nature of their use and control of the property that was involved in the search." *Id.* at 411. On appeal, the state acknowledged that "there [was] nothing in the record to establish whether youth's mother had a right to control the effects of her daughter," we agreed, and

we concluded that the trial court erred in failing to suppress the evidence. *Id.* at 411-12.

More recently, in *J. D. H.*, we considered a youth's argument that the trial court had erred in denying his motion to suppress because his mother lacked authority to consent to a search of certain closed containers in his room—*viz.*, a guitar case and journal. 294 Or App at 365. When police officers conducted the search at issue, the youth was 17 years old and living with his mother. *Id.* The trial court had concluded that the youth's mother had "actual authority to consent to a search of [youth's] bedroom," reasoning, in part, that

"[s]he was an involved parent who had house rules and access to all areas of the house. There were no private areas. There was not a padlock on [youth's] bedroom door or any other barrier, a 'do not enter' sign or other expression by [youth] that could be seen to limit [youth's] mother's access to [youth's] bedroom. [Youth] had never told or asked his mother not to go in his room, not to look in his guitar case, journal or other 'container.' Importantly, [youth] was a minor, subject to parental authority, guidance and discipline, including control over his living environment including his bedroom. Further, [youth] was on probation and his mother, as a parent and a party to the proceeding, was obligated—and [youth] knew this—to maintain close supervision over [youth], his companions and his surroundings as a part of that probation."

*Id.* at 368 (brackets in *J. D. H.*).

On appeal, we affirmed. We reasoned that,

"unlike the premises searched in *Carsey*, which were under 'exclusive control' of the defendant, * * * youth did not have exclusive control over his room or its contents. Rather, youth shared control over the contents of his bedroom with his mother, and youth's mother had unrestricted access to the items in youth's room."

*Id.* at 374. Further, we determined that, the "nature of the parent-child relationship, * * * unlike the parental relationship in *Carsey*, support[ed] the trial court's conclusion that youth's mother had actual authority to consent to the search of" closed containers in youth's room, as

> "[y]outh's mother was an 'involved parent,' there were 'no private areas' in their household, youth was a minor 'subject to parental authority, guidance and discipline,' youth 'had never told or asked his mother not to go in his room, not to look in his guitar case, journal or other "container,"' and youth's mother entered his room almost daily. In fact, youth never 'expressed any *** expectation of privacy from his mother.' Additionally, youth's mother, as a parent and a party to the prior adjudication that resulted in youth being on probation, 'was obligated to maintain close supervision over [youth] *** and his surroundings.'"

*Id.* (omissions and second brackets in *J. D. H.*).[8]

With that analytical framework in mind, I turn back to what I view to be the correct disposition of this case. As set forth above, "'[w]hether [a] third party had actual authority [to consent to a search] involves a resolution of factual issues, but the question of whether a person ha[d] actual authority at the time consent is given is ultimately a question of law.'" *Bonilla I*, 267 Or App at 341 (quoting *Surface/Hurley*, 183 Or App at 372-73 (fourth brackets in *Bonilla I*)). The juvenile court did not reach that issue, due to its conclusion that youth's consent was voluntary, but the question whether youth's mother had actual authority to consent was argued to the juvenile court.

Both parties have briefed and argued that issue on appeal and assert that we should resolve the legal issue on the record before us. But it is not appropriate for us to resolve that issue. "[W]ith respect to alternative grounds for affirmance raised before, but not resolved by, the trial court—we will ordinarily remand to the trial court to determine potentially dispositive questions of fact in the first instance." *State v. Lovaina-Burmudez*, 257 Or App 1, 14, 303 P3d 988, *rev den*, 354 Or 148 (2013). "But we do so only if the evidence, with nonspeculative derivative inferences, is legally sufficient to permit the trial court to endorse the alternative ground. Otherwise, a remand for reconsideration

---

[8] In light of *Carsey*, *S. L. M.*, and *J. D. H.*, I believe the majority should consider the particular circumstances of this case, which involves a 12-year-old child who did not refuse to consent to a buccal swab. Instead, in this case, the evidence suggests that youth may have looked to his mother for guidance, and his mother had to consider how to best direct youth when youth was accused of sexually abusing a younger member of their family.

would be gratuitous." *Id.*; *State v. Blackstone*, 289 Or App 421, 431, 410 P3d 354 (2017) (noting if "any potentially dispositive fact questions existed, we *** remand for the trial court to make those findings and address the alternative ground in the first instance"). In this case, in light of youth's mother's testimony concerning her and youth's relationship, it is appropriate for us to reverse and remand to the juvenile court for it to determine if youth's mother had actual authority to consent to a search of youth's mouth, including making any necessary factual findings and credibility determinations.

In the context of analyzing whether a parent has authority to consent to a search under the common-authority rule, "where parents have ceded some measure of control over *** their child, the presence or absence of common authority hinges, necessarily, on the particular agreement between parent and child." *State v. Jenkins*, 179 Or App 92, 101, 39 P3d 868, *rev den*, 334 Or 632 (2002). In this case, youth's mother's testimony at the hearing on youth's motion to suppress was that youth had "control over his body," that she had "given him an expectation that his body is his," that she had not "given him an expectation that [she] can control [his] body in any way," and that she had had conversations with youth "about his body being private." If the juvenile court were to credit that testimony, it would potentially be dispositive, as it would demonstrate that youth—not youth's mother—generally had control over youth's body, and shared an understanding that youth's body, was private. That is, the particular relationship between youth and his mother in this case could demonstrate the absence of youth's mother's authority to consent to a search of youth's body.

But the state contends that "the record shows that mother had the authority to consent" to the search of youth's mouth and the seizure of his saliva. In the state's view, this case "involve[d] a child far from the age of maturity, who voiced no objection, and whose mother authorized a minimally intrusive cheek swab." The state also points to youth's mother's testimony that "as a general matter, her twelve-year-old son was compliant and did what she told him to do"; that "[w]hen youth received a phone call while the detective was present *** mother told him to 'just stay here,' 'wait a

minute,' and to tell his friend that he would return the call later"; and that when "the detective asked youth to take the swab, mother told youth 'that it was okay' to do so."

We note that the evidence the state points to potentially conflicts with youth's mother's other testimony regarding youth's mother's control over youth's body, and the level of privacy youth enjoyed *viz-à-viz* his mother. *See State v. Lambert*, 265 Or App 742, 747, 338 P3d 160 (2014) ("[R]emand *** is appropriate only if the record contains potentially conflicting evidence that needs to be resolved."). Hence, the evidence the state points to is not dispositive.

In light of the above considerations, I believe remand is appropriate for the juvenile court to determine whether youth's mother had actual authority to consent to a search of youth's mouth, and in doing so, determine any pertinent facts concerning the relationship between youth's mother and youth, the understanding between youth and youth's mother regarding youth's body, and the import of the evidence to which the state points. *See State v. Madden*, 363 Or 703, 725-26, 427 P3d 157 (2018) (reversing and remanding where a "fact-intensive analysis" was required for the determination of a suppression issue that the trial court "expressly declined to decide" in the first instance); *Bonilla I*, 267 Or App at 341 (noting that "[w]hether [a] third party had actual authority [to consent to a search] involves a resolution of factual issues" (internal quotation marks omitted)).

Armstrong, DeVore, DeHoog, and Mooney, JJ., join in this dissent.